UNITED STATES of America, Appellee,

v.

Anthony J. BUCCI, Sr. and Ronald H. Glantz, Defendants, Appellants.

No. 87–1271.

United States Court of Appeals, First Circuit.

Heard Oct. 8, 1987.

Decided Jan. 13, 1988.

As Amended Feb. 25, 1988.

Robert B. Mann, Providence, R.I., for appellant Ronald H. Glantz.

Anthony J. Bucci, Jr., with whom Bucci Law Offices, Providence, R.I., was on brief, for appellant Anthony J. Bucci, Sr.

John M. Campbell, Dept. of Justice, Public Integrity Section, Criminal Div., with whom William F. Weld, Asst. Atty. Gen., Criminal Div., Washington, D.C., Lincoln C. Almond, U.S. Atty., and Anthony C. DiGioia, Asst. U.S. Atty., Providence, R.I., were on brief, for appellee.

Before CAMPBELL, Chief Judge, COFFIN and BOWNES, Circuit Judges.

BOWNES, Circuit Judge.

On October 25, 1985, a grand jury returned an indictment charging defendants Ronald Glantz and Anthony J. Bucci with conspiracy to commit extortion (Count I) and extortion (Count II) in violation of 18 U.S.C. § 1951 (Hobbs Act).[1] At the time of the alleged extortion, Glantz was City Solicitor of Providence, and Bucci was an attorney in private practice. Bucci's brother-in-law, Clement Cesaro, was then director of the Providence Department of Public Works, a position he obtained with Bucci's assistance. After a three-week trial, a jury found appellants guilty of extorting $77,350 from James Notarantonio in exchange for a contract from the City of Providence.

In another appeal from this same conviction, *United States v. Glantz*, 810 F.2d 316 (1st Cir.), *cert. denied*, — U.S. —, 107 S.Ct. 3214, 96 L.Ed.2d 701 (1987), we reversed the district court's order granting defendants a new trial. The court had allowed a new trial because it believed that the prosecutor's closing argument had improperly influenced the jury. We concluded that the "substantially appropriate nature of the prosecutor's comments, the repeated correction of any possible deficiencies, and the strong government case all [led] to the conclusion that the district court abused its discretion in taking the rare step of ordering a new trial." *Id.* at 324. In this appeal, appellants challenge their conviction on different grounds. They claim that the district court erred by denying their motion for: (1) judgment of acquittal for failure by the government to prove a Hobbs Act violation; and (2) mistrial for impermissible use by the government of peremptory challenges. Bucci also claims that the district court erred in denying his motion for dismissal of the indictment for abuse of the grand jury process. Appellants finally contend that the district court erred in imposing the sentence. We affirm the conviction, but remand for resentencing.

## FACTS

Notarantonio testified as follows. In early 1979, Glantz, whom Notarantonio knew to be the City Solicitor and an aide to the Mayor, called him to ask whether he would be interested in leasing garbage trucks to the City of Providence. Notarantonio agreed and made plans for acquiring the trucks. At some point in late March or early April, Glantz summoned Notarantonio to drive with him to a meeting in Boston. Just before arriving at Anthony's Pier 4 Restaurant, where the meeting was to take place, Glantz informed Notarantonio that they would be meeting with Anthony Bucci, whom Notarantonio knew of as a powerful political leader in Providence. Once the three men were seated together in the restaurant, Glantz informed Notarantonio that Bucci could "put this deal together with the garbage trucks." Bucci agreed, but added that he wanted "twenty percent." When Notarantonio objected, Bucci assured him that "money [would be] no object" because Cesaro, the highway director, was his brother-in-law. Notarantonio testified that it was his understanding at the close of the meeting that if he refused to agree to pay appellants twenty percent, "there would [be] no deal." The next day, Notarantonio telephoned Glantz to tell him that he "could put the

---

1. Bucci was also charged on two other counts: with conspiracy to defraud the Internal Revenue Service and overt acts in furtherance of that conspiracy; and with fraudulent representations to the Internal Revenue Service.

package together." Glantz responded by informing Notarantonio of the price that the city would pay for each truck. In the contract that Notarantonio signed with Cesaro on May 10, 1979, Notarantonio agreed to lease the city ten garbage trucks for two years at a monthly cost per vehicle of $2,100, the exact amount set by Glantz on the telephone weeks before.[2] From July 27, 1979 through October 30, 1980, Notarantonio delivered eight checks to appellants. On most occasions he gave them each check soon after receiving payment from the city for the lease of the garbage trucks.[3]

### THE HOBBS ACT VIOLATION

█ Appellants assert that the district court erred in not granting their motion for a judgment of acquittal under Federal Rule of Criminal Procedure 29.[4] First, they contend that the government did not prove a Hobbs Act violation because it did not show that appellants induced payment from Notarantonio through fear of economic loss. Second, they contend that by failing to establish that they induced the last payment—arguably the only one made within the statute of limitations—through fear of economic loss and under color of official right, the government failed to prove a Hobbs Act violation within the statute of

limitations. Finally, they argue that the government failed to show that appellants' conduct affected interstate commerce within the meaning of the Act. As we address each of these arguments, we will consider the evidence as a whole in the light most favorable to the government to determine whether a rational trier of fact could have found appellants' guilt beyond a reasonable doubt. *See United States v. Smith*, 680 F.2d 255, 259 (1st Cir.1982), *cert. denied*, 459 U.S. 1110, 103 S.Ct. 738, 74 L.Ed.2d 960 (1983).

The Hobbs Act prohibits extortion affecting interstate commerce.[5] By "extortion" the Act means "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2) (1982). Like other circuits, we have interpreted this definition in the disjunctive, finding that the prosecution can establish a violation by showing that a defendant induced payment *either* through the use of actual or threatened force, violence, or fear, *or* under color of official right. *See United States v. Kelly*, 722 F.2d 873, 875 (1st Cir.1983), *cert. denied*, 465 U.S. 1070, 104 S.Ct. 1425, 79 L.Ed.2d 749 (1984). Moreover, we have clarified that "fear" can mean the "fear of economic loss," *United States v. Hatha-*

2. As we noted in the prior appeal, the government "showed that Cesaro departed from normal city procedures when he requested unlimited discretion to negotiate the garbage truck lease with Notarantonio. The lease itself also reflected a deviation from the norm, lacking a signature line for the mayor and instead containing Cesaro's signature." *United States v. Glantz*, 810 F.2d 316, 317–18 (1st Cir.), *cert. denied*, —— U.S. ——, 107 S.Ct. 3214, 96 L.Ed.2d 701 (1987).

3. The checks were dated as follows: July 27, 1979, $13,350; October 11, 1979, $8,000; December 5, 1979, $4,000; January 1980, $4,000; January 1980, $4,000; February 2, 1980, $8,000; April 15, 1980, $12,000; and October 30, 1980, $24,000. The total of these checks came to $77,350.

4. Rule 29(a) provides that the court "on motion of a defendant or of its own motion shall order the entry of judgment of acquittal of one or more offenses charged ... if the evidence is insufficient to sustain a conviction of such of-

fense or offenses." The court may issue such an order after the evidence on either side is closed (29(a)), after submitting the case to the jury but before the jury returns a verdict (29(b)), or after the jury returns a guilty verdict or is discharged without having returned a verdict (29(c)). Appellants made a motion for acquittal under Rule 29 three times, first after the close of the government's case, again at the conclusion of the trial, and once after the court questioned the government's primary witness in the absence of the jury.

5. The Act provides that
   [w]hoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.
   18 U.S.C. § 1951(a) (1982).

*way,* 534 F.2d 386, 394 (1st Cir.), *cert. denied,* 429 U.S. 819, 97 S.Ct. 64, 50 L.Ed. 2d 79 (1976), including "the possibility of lost business opportunities...." *Id.* at 396.

*The Inducement for Payment*

Notarantonio's testimony provided more than sufficient evidence from which the jury could conclude that appellants conspired to induce and did induce the payment from Notarantonio both through fear of economic loss and under color of official right. Although it is true that neither Glantz nor Bucci specifically threatened Notarantonio with loss of the potential contract, the government need not establish that they actually issued such a threat. Its burden is satisfied if it can show that the victim believed that economic loss would result from his or her failure to comply with the alleged extortionist's terms, and that the circumstances surrounding this conduct rendered that fear reasonable. *See United States v. Billups,* 692 F.2d 320, 330 (4th Cir.1982), *cert. denied,* 464 U.S. 820, 104 S.Ct. 84, 78 L.Ed.2d 93 (1983); *see also United States v. Lisinski,* 728 F.2d 887, 891 (7th Cir.1984); *Hathaway,* 534 F.2d at 395. The victim, in short, must have understood the defendant's conduct as an implied threat.

In this case, the strongest proof that Notarantonio understood appellants' conduct as an implied threat comes from Notarantonio himself. He testified that appellants communicated to him during the meeting that he would not be awarded the contract if he refused to agree to pay them twenty percent of it. From this, the jury could conclude that Notarantonio feared the possibility of losing an important business opportunity. *See Hathaway,* 534 F.2d at 394, 396. The jury could further conclude that Notarantonio feared the loss not only of future income from contract payments, but income already invested in a number of the trucks by the date of the meeting. As he bluntly put it: "it was either do it or forget it.... [and] I already had trucks purchased." Finally, the jury could conclude that Notarantonio feared that if he stopped making kickbacks for the duration of the contract, he would stop receiving payments from the city. *See United States v. Swift,* 732 F.2d 878, 879 (11th Cir.1984), *cert. denied,* 469 U.S. 1158, 105 S.Ct. 905, 83 L.Ed.2d 920 (1985).

Notarantonio also testified to the reasonableness of his belief after the meeting that appellants could carry through on their implied threat to deny him the contract. He knew that as head of the city's legal department and aide to the Mayor, Glantz "could get [him] out" as easily as "he got [him] in." He also knew that Bucci was a powerful political leader in Providence. And he learned during the meeting that Bucci had particular influence over the contract award in this case because Cesaro, the head of the department that would be leasing the trucks, was Bucci's brother-in-law. It is not important, as Glantz and Bucci suggest, that neither of them *directly* controlled the awarding of contracts. Rather, the government need only show as it did that Notarantonio held, and appellants exploited, a reasonable belief that these two men—City Solicitor and aide to the Mayor, on the one hand, and city political leader and brother-in-law of the head of the Department of Public Works, on the other—had the power to determine whether he would receive the contract award and subsequent payments under it. *See United States v. Mazzei,* 521 F.2d 639, 643 (3d Cir.), *cert. denied,* 423 U.S. 1014, 96 S.Ct. 446, 46 L.Ed.2d 385 (1975); *see also United States v. Blackwood,* 768 F.2d 131, 135–36 (7th Cir.), *cert. denied,* 474 U.S. 1020, 106 S.Ct. 569, 88 L.Ed.2d 554 (1985).

Appellants rely heavily upon *United States v. Capo,* 817 F.2d 947 (2d Cir.1987) (en banc) in attempting to distinguish the circumstances of their case from those implicating the crime of extortion. In *Capo,* the prosecution revealed a job-selling scheme, in which the defendants used their influence at an Eastman Kodak plant to secure employment for individuals in exchange for payment. The court reversed the conviction under the Hobbs Act because there was "no evidence at all to suggest that it would have been reasonable for the 'victims' to believe that if they did not pay, the defendants would exploit [their

influence] to diminish [the 'victims'] employment opportunities." *Id.* at 951. Rather, the court concluded, these "victims" paid "to achieve a result [they] had been unable to attain on [their] own." *Id.* at 953. In this case, by contrast, there was more than sufficient evidence from which the jury could conclude that Notarantonio reasonably believed that appellants would exploit their powers to deny him the contract if he did not agree to make the kickback payments. Appellants' effort to bend the facts to bring their case within the holding of *Capo* is without merit.

*The Last Payment*

The grand jury returned the indictment against appellants on October 25, 1985. Because the statute of limitations for a Hobbs Act violation is five years, 18 U.S.C. § 3282, the government could prevail only by showing that a violation under the Act occurred on or after October 25, 1980. The last payment made by Notarantonio to appellants was a check dated October 30, 1980.

Appellants argue that the government failed to show that appellants induced this October 30 payment through fear of economic loss or under color of official right. Their contention reduces to the somewhat incredible assertion, in light of their accusation that Notarantonio was a "liar, a perjurer, and a convicted thief," that Notarantonio made the payment in fulfillment of his earlier "promise" to appellants. Notarantonio's testimony, they claim, shows beyond a reasonable doubt that any allegedly wrongful inducement had dissipated completely by October 30, 1980. In particular, they point to the following discussion about the October 30 payment, elicited from Notarantonio upon direct examination:

Q—Why if you didn't make any payments after that check, why did you make this payment to Mr. Glantz?

A—Well, there's a couple of reasons why I made this payment, I had promised him I was going to make this payment, plus the fact after this I didn't need them any longer. I had the garbage contract, I had my money from SBA, and Mr. Glantz—

. . . .

Q—Mr. Notarantonio, I believe your last words [were] "and Mr. Glantz," do you remember what you were going to say to finish that answer?

A—Yes, I believe I was going to say Mr. Glantz was getting ready to retire from the City of Providence and, therefore, it would be like feeding oats to a dead horse, I didn't need him, he wasn't there. He couldn't do me any good.

Q—How did you know he was going to be leaving?

A—He told me that.

Q—And do you know if he did leave?

A—I believe he did.

Q—Okay. Your last payment . . . the check we were talking about yesterday when we stopped, was that a payment made because of the used garbage truck lease that you had with the City of Providence?

A—Yes, that payment was for the garbage truck lease. That was the agreement we had made at Anthony's Pier 4.

Appellants claim that when Notarantonio delivered the check on October 30, he neither feared economic loss nor the coercive effect of public office, because he "had the garbage contract" and Glantz had become a "dead horse."

Notarantonio's testimony does not, as appellants assert, prove the absence of a Hobbs Act violation. In fact, from this same testimony, the jury could reasonably infer that Notarantonio made references to appellants' diminished power only to explain why he *stopped* making further payments *after* October 30, and not to explain why he made the October 30 payment itself. The jury could also infer from Notarantonio's rather clear answer—the "payment was for the garbage truck lease"— that the October 30 payment was a part of the same series of kickbacks as all the others, and induced by the same extortionate demand.

The indictment charged appellants in two counts of one Hobbs Act violation "beginning in February, 1979 [and continuing] through on or about November 6, 1980." The government proved this charge by

presenting overwhelming evidence that all the payments—including the one delivered on October 30—"were the consummation of [an] extortionate scheme which was a single and unified one." *United States v. Provenzano,* 334 F.2d 678, 685 (3d Cir.), *cert. denied,* 379 U.S. 947, 85 S.Ct. 440, 13 L.Ed.2d 544 (1964). As one court held in another Hobbs Act case:

> If [the victim's] payments of money to [the defendant] in the pre-limitation period were reasonably impelled by fear, the jury was entitled to infer that the payments made by [the victim] to [the defendant] within the period not barred by the statute of limitations were also and similarly impelled by [the victim's] fears
>
> . . . .

*Id.* at 687. *See also United States v. Forszt,* 655 F.2d 101, 104 (7th Cir.1981). The jury in this case heard evidence of how, after signing the contract, Notarantonio made each of the eight payments at the request of and in the manner prescribed by appellants. It also heard evidence of how, after making the payment on April 21, 1980, Notarantonio asked appellants for a six-month delay in kickbacks, thereby resulting in the unusually large check for $24,000 on October 30. From this, the jury could reasonably conclude that Notarantonio's fear that appellants both could and would cause him to suffer economic loss if he did not make the payments induced him to make *every* payment in the series, including the last one.

*The Effect Upon Interstate Commerce*

Appellants contend that their conduct in allegedly taking money from Notarantonio did not affect interstate commerce within the meaning of the Hobbs Act. Conceding that Notarantonio purchased some of the trucks leased to the City of Providence from outside of Rhode Island, appellants nevertheless assert that this effect upon interstate commerce was too attenuated to satisfy the Act's requirement. The government argues that appellants' conduct did affect interstate commerce, as that term has been construed under the Hobbs Act. We agree with the government.

In *Hathaway,* we rejected the contention that a trial court had improperly instructed the jury when it said that only a slight or minimal impact on interstate commerce need be shown to satisfy the Hobbs Act. We approved the instruction, noting that it has been consistently held that the alleged extortion need only have a *de minimis* effect on interstate commerce. The Hobbs Act by its own terms forbids extortion which affects commerce "in any way or degree", 18 U.S.C. § 1951(a), and has accordingly been held to reach even those effects which are "merely potential or subtle".

*Hathaway,* 534 F.2d at 396 (citations omitted). In this case, the government provided sufficient evidence from which the jury could conclude that the effects of appellants' conduct upon interstate commerce were more than merely "potential or subtle." First, Notarantonio purchased the trucks leased to the City of Providence from out of state. *See United States v. Digregorio,* 605 F.2d 1184, 1191 (1st Cir.), *cert. denied,* 444 U.S. 937, 100 S.Ct. 287, 62 L.Ed.2d 197 (1979). Moreover, the cash payments made by Notarantonio to appellants depleted assets of his that would have been available for use in other business ventures involving interstate commerce. *See United States v. Rindone,* 631 F.2d 491, 493–94 (7th Cir.1980); *Digregorio,* 605 F.2d at 1190–91; *Hathaway,* 534 F.2d at 396–97; *cf. United States v. Jarabek,* 726 F.2d 889, 901 (1st Cir.1984) (finding the requisite effect upon interstate commerce in showing that the defendants would have injured victim's business, which depended upon interstate commerce, if the victim had not complied with their demands for payment). And finally, the monthly lease price paid by the City of Providence was inflated in order to cover the kickback payments to appellants. This depleted the assets of the city, which also purchased goods from out of state. *See United States v. Boston,* 718 F.2d 1511, 1516–17 (10th Cir.1983), *cert. denied,* 466 U.S. 974, 104 S.Ct. 2352, 80 L.Ed.2d 825 (1984).

GRAND JURY ABUSE

Bucci claims that the court erred in not dismissing his indictment because of prose-

cutorial misconduct before the grand jury.[6] His allegations reduce to the following three assertions. First, he claims that the government failed to impeach the testimony of Notarantonio, the primary witness against appellants, when Notarantonio allegedly perjured himself before the grand jury. Second, he asserts that the government "inflame[d] the grand jury" with suggestions of wrongful financial activity "which [the government] knew [were] not remotely criminal with respect to Mr. Bucci." And finally, he claims that the government failed to present the grand jury with evidence exculpating him.

We can easily dispose of the last allegation because a reading of the record reveals that it is simply not true. The exculpatory evidence referred to comprises ten affidavits,[7] eight of them from the members of the Providence Board of Contract and Supply who voted to award Notarantonio the contract. All eight attest to the assertion that neither appellant made any attempt to influence the award of the garbage truck lease. The remaining two attest that Notarantonio retained Bucci to provide legal services. The prosecution presented all ten affidavits to the grand jury on October 3, 1985.

██ The first and second allegations seem to rest upon the claim that the indictment was invalid because it was based in part upon unfairly prejudicial evidence and perjured testimony. Bucci asserts that the jurors received the erroneous impression that he appropriated an additional $100,000 from Notarantonio, and Glantz an additional $200,000 from the city in unrelated transactions. Bucci also claims that Notarantonio lied before the grand jury by denying that he lied before another grand jury in 1983, denying responsibility for the fraud for which he was serving a two-year

prison sentence, and failing to admit to certain "rewards" and "inducements" offered by the government in exchange for his testimony. In short, Bucci claims that the government failed to bring out before the grand jury that Notarantonio was a "liar, a perjurer, a convicted thief and a tax cheat" who was "under the gun to please his potential benefactors."

Initially, we point out that, even if Bucci's assertions of unfair prejudice and perjury were correct, this alone would not warrant overturning the conviction. We will order dismissal of an indictment only "for serious and blatant prosecutorial misconduct that distorts the integrity of the judicial process." *United States v. Ogden,* 703 F.2d 629, 636 (1st Cir.1983). The government "is normally not under a duty to disclose exculpatory evidence to the grand jury." *United States v. Wilson,* 798 F.2d 509, 517 (1st Cir.1986); *see also United States v. Page,* 808 F.2d 723, 727–28 (10th Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 3195, 96 L.Ed.2d 683 (1987).[8] Nor is the government obligated to present evidence that impeaches the credibility of its own witnesses. *See United States v. Smith,* 552 F.2d 257, 261 (8th Cir.1977); *cf. United States v. Calandra,* 414 U.S. 338, 344–45, 94 S.Ct. 613, 618, 38 L.Ed.2d 561 (1974) (stating that the "grand jury's sources of information are widely drawn ... [and] an indictment valid on its face is not subject to challenge on the ground that the grand jury acted on the basis of inadequate or incompetent evidence").

Moreover, we do not overlook *United States v. Mechanik,* 475 U.S. 66, 106 S.Ct. 938, 942, 89 L.Ed.2d 50 (1986), which recognizes that at least some "errors, defects, irregularities or variances" attending the grand jury proceeding may be rendered

---

**6.** Bucci made similar claims before the district court on two separate occasions: once in a pretrial motion to disclose the grand jury minutes and dismiss the grand jury indictment; and again in a motion for a new trial based in part on abuse of the grand jury process. The court denied the first motion. It granted the second motion on the basis of prosecutorial misconduct during closing argument but not on the basis of grand jury abuse.

**7.** Bucci refer to eleven affidavits in his brief, but the record shows only ten.

**8.** A prosecutor may, however, be obligated to disclose substantial evidence negating guilt. *See United States v. Page,* 808 F.2d 723, 727–28 (10th Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 3195, 96 L.Ed.2d 683 (1987); *United States v. Wilson,* 798 F.2d 509, 517 n. 2 (1st Cir.1986).

harmless by the verdict of the petit jury. Although we recognize that there could be allegations of grand jury abuse so troubling as to warrant an assessment, under *Mechanik,* of whether the "societal interest in deterring the type of abuses alleged" outweighed the "societal costs of retrial," *United States v. Larouche Campaign,* 829 F.2d 250, 253 (1st Cir.1987), we do not find that the abuses alleged here warrant such an assessment.

## THE PEREMPTORY CHALLENGES

Appellants argue that because the government used its peremptory challenges to discriminate against Italian–American, the court erred in not granting their motion for a mistrial. They made the motion after the government used three of its first four challenges to strike jurors having what appellants claimed were Italian–American surnames. The court reserved judgment on the motion, and jury selection continued. The government used only one of its remaining four challenges to strike a juror with an alleged Italian–American surname.[9] Of the sixteen jurors eventually selected, three of the twelve regular jurors, and three of the four alternatives, arguably had Italian–American surnames.[10]

The next day, the court denied the motion for a mistrial in an order read from the bench. It ruled first that *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), barred the challenge on equal protection grounds. The court then went on to consider the challenge on sixth amendment grounds. It assumed, for "purposes of argument ... that Italian–Americans are a sufficiently well-defined group in this community so that they can be considered 'cognizable.'" The court

then relied upon *McCray v. Abrams,* 750 F.2d 1113, 1131 (2d Cir.1984), in ruling that "defendants have failed to establish a substantial likelihood that the prosecution, systematically used its pre-emptory [sic] challenges to exclude all Italian–Americans from the jury panel."[11] This ruling was followed by specific findings as to what challenges were made. The court noted finally that the motion "really has been decided on pure speculation" because neither it nor defense counsel "are experts able to ascertain from surnames who is or is not Italian–American" and that defense counsel had not presented information on the lineage of the entire jury venire so that the court could determine whether the prosecution was saving its challenges so as to strike only Italian–Americans.

■ This order was later amended in a footnote to the court's written order granting appellants' motion for a new trial on the basis of prosecutorial misconduct during closing argument. In the footnote, the court noted that *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), overruled *Swain.* It then held, based on its findings denying the motion for a mistrial, that appellants had not made out a prima facie case under *Batson* of purposeful discrimination in selecting the petit jury. We agree.

In *Swain,* the Supreme Court held that a defendant could make out an equal protection claim against the prosecution's use of peremptory challenges only by showing that the prosecutor systematically, "in case after case, whatever the circumstances," removed blacks from the jury "with the result that no [blacks] ever serve[d] on petit juries." *Swain,* 380 U.S. at 223, 85 S.Ct. at 838. *Batson* overruled *Swain.* It

---

**9.** The first three jurors struck by the government were Frank DiMaio, Jack Coppolla, and Joseph D'Angelo. The last juror struck was John Kinsella.

**10.** The regular jurors were Alan Lawrence, Beatrice O'Leary, Linda Rossi, Linda Martin, Rose Ascoli, Velma Brown, Richard DiCarlo, Susanne Lowell, Germaine Whitman, Stanley Berek, Charles McKinnon, and Kevin Dwyer. The government asserts that those with Italian sounding surnames were Linda Rossi, Rose As-

coli, and Richard DiCarlo. The alternates were Hugh Emeno, Shirley Benefeito, Fred Cappuccilli, and Edward MacCoy, Jr. The government asserts that all but Edward MacCoy had Italian sounding surnames.

**11.** Subsequent to the court's ruling, *McCray* was remanded by the Supreme Court in light of *Batson. See Abrams v. McCray,* — U.S. —, 106 S.Ct. 3289, 92 L.Ed.2d 705 (1986); *see also Roman v. Abrams,* 822 F.2d 214, 225 (2d Cir. 1987).

held that "a defendant may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial." *Batson*, 106 S.Ct. at 1722–23. To establish such a case,

> the defendant must first show that he is a member of a cognizable racial group, *Castaneda v. Partida, supra*, 430 U.S., at 494, 97 S.Ct., at 1280, and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race.... [T]he defendant must [then] show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race.

*Id.* at 1723.

We think that the Court's specific reference to *Castaneda*, which found Mexican–Americans a cognizable group under the equal protection clause, means that its decision applies to all ethnic and racial minority groups in addition to blacks that meet its criteria. In *Castaneda, v. Partida*, 430 U.S. 482, 494, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498 (1977), the Court stated that a defendant seeking to prove an equal protection violation in the context of grand jury selection had to "show that the procedure employed resulted in substantial underrepresentation of his race *or of the indentifiable group to which he belongs.*" (Emphasis added). In *Hernandez v. Texas*, 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954), relied upon in *Castaneda*, 430 U.S. at 495, 97 S.Ct. at 1280, the Court made clear that "identifiable" groups were those that had been subjected to discriminatory treatment. It said:

Throughout our history differences in race and color have defined easily identifiable groups which have at times required the aid of the courts in securing equal treatment under the laws. But community prejudices are not static, and from time to time other differences from the community norm may define other groups which need the same protection. Whether such a group exists within a community is a question of fact. When the existence of a distinct class is demonstrated, and it is further shown that the laws, as written or as applied, single out that class for different treatment not based on some reasonable classification, the guarantees of the Constitution have been violated. The Fourteenth Amendment is not directed solely against discrimination due to a "two-class theory"— that is, based upon differences between "white" and Negro.

*Hernandez*, 347 U.S. at 478, 74 S.Ct. at 670.

Whether Italian–Americans comprise a group needing "protection" from "community prejudices" is a "question of fact." *Id.* Ethnic and racial definitions, as the Court recognized in *Hernandez*, change over time. The important consideration for equal protection purposes is not whether a number of people *see themselves* as forming a separate group, but whether others, by treating those people unequally, *put them* in a distinct group.[11a] Because appellants did not even attempt to show that Italian–Americans either have been or are currently subjected to discriminatory treatment, their claim fails to meet the initial requirement under *Batson* that the defendant show his or her membership in a "cognizable" group.[12]

With regard to the defendants' claim that the government's exercise of

---

**11a.** We would reach the identical result under the analysis in our earlier opinion in *United States v. Sgro*, 816 F.2d 30 (1st Cir.1987). In *Sgro* we assumed, without deciding, that *Batson* principles would extend to ethnic as well as racial constituencies and thought it "no longer subject to question" that the *Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), Sixth Amendment standard applied to determining cognizability. 816 F.2d at 33. However, the

specific reference in *Batson* to *Castaneda v. Partida*, and the latter's reference to *Hernandez v. Texas*, indicates that the cognizability standard is further limited in this situation to those groups that have been discriminated against.

**12.** We also note that neither appellant presented evidence that "he is a member of [the Italian–American] group." *Batson*, 106 S.Ct. at 1723.

peremptory challenges violated their sixth amendment rights, we are in full agreement with the district court that such a claim is based on pure conjecture. Even assuming that Sixth Amendment analysis applies to the exercise of peremptory challenges, *but see Lockhart v. McCree,* 476 U.S. 162, 106 S.Ct. 1758, 1765, 90 L.Ed.2d 137 (1986), there was no evidence presented from which it could be found that persons whose surname ends in a vowel are Italian–Americans. Those claiming that the prosecution has exercised its peremptory challenges in a discriminatory way must give some evidence of the ethnic or racial composition of the community from which the jurors are drawn and of what surname endings indicate about that ethnic or racial composition. *See United States v. Sgro,* 816 F.2d 30, 33 & n. 2 (1st Cir.1987) (citing *Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979)).

## SENTENCING

■ At the sentencing hearing appellants alleged that the presentence report contained several inaccuracies.[13] In response, the court said:

> Now, I do not believe that it is necessary I make any findings as to these alleged inaccuracies. However, I do take them into consideration.... [B]ut, in my opinion, such allegations do not in any way diminish the seriousness of the offense, and the findings of guilty made by the jury which considered all of the evidence.

Appellants claim that because the court failed to make explicit findings as required by Federal Rule of Criminal Procedure 32(c)(3)(D),[14] resentencing is required. The government asserts instead that these

statements reflected a finding by the court in favor of appellants on each point. It urges that we remand for the district court to append such findings to the presentence report.

We agree with appellants that the court's statement was ambiguous. It is possible that the court, in "tak[ing] [the alleged inaccuracies] into consideration" did in fact find for appellants on each allegation. It is also possible that the court was merely recognizing the allegations without deciding their merit.

But the court's failure to comply with the literal requirements of Rule 32(c)(3)(D) does not automatically require resentencing. In *United States v. Serino,* 835 F.2d 924 (1st Cir.1987), we recognized that resentencing may be an appropriate remedy for failure to comply strictly with Rule 32(c)(3)(D) when "it is plain that the court relied on the challenged information in determining the sentence. ... [or] when it is ambiguous whether the challenged information may have significantly influenced the nature or length of sentence imposed." *Serino,* at 932 (citations omitted). Since neither contingency was present in *Serino,* we ruled that the most suitable course to follow would be to remand to the sentencing judge for appropriate findings.

Here, the court did not plainly rely upon the challenged information. Nor does it appear that the challenged information significantly influenced the nature or length of the sentence meted out. Therefore, the situation conforms squarely with that presented in *Serino,* and we follow its directive. If, upon remand,

> the district judge indicates that the disputed items were not taken into any ac-

---

**13.** The alleged inaccuracies are: (1) an overstatement of the loss sustained by the City of Providence; (2) an overstatement of the amount received by Glantz in connection with the illegal activities; and (3) a misstatement of the contents of a letter written by Notarantonio and dated March 19, 1979.

**14.** Rule 32(c)(3)(D) provides:

If the comments of the defendant and the defendant's counsel or testimony or other information introduced by them allege any factual inaccuracy in the presentence investiga-

tion report or the summary of the report or part thereof, the court shall, as to each matter controverted, make (i) a finding as to the allegation, or (ii) a determination that no such finding is necessary because the matter controverted will not be taken into account in sentencing. A written record of such findings and determinations shall be appended to and accompany any copy of the presentence investigation report thereafter made available to the Bureau of Prisons or the Parole Commission.

count for purposes of sentencing and endorses a written disclaimer to that effect on the presentence report, then the sentence should stand. If, however, those items were taken into account for sentencing purposes, then the district court should so indicate and should vacate the sentence and proceed to hold a new sentencing hearing which complies fully with the requirements of Fed.R.Crim.P. 32(c)(3)(D).

*Serino,* at 932.

We have considered all of the other issues raised by appellants and dismiss them as meritless.

The verdict of the jury will stand. The case is remanded to the district court for proceedings consistent herewith.