UNITED STATES, Appellee,

v.

Jose Luis LATORRE, a/k/a "El Cano,"
Defendant, Appellant.

UNITED STATES, Appellee,

v.

Carlos Ivan LATORRE,
Defendant, Appellant.

UNITED STATES, Appellee,

v.

Ramon FERRAS–LAGO,
Defendant, Appellant.

UNITED STATES, Appellee,

v.

Antonio MARRERO–FIGUEROA,
Defendant, Appellant.

Nos. 88–1241 through 88–1244.

United States Court of Appeals,
First Circuit.

Heard Oct. 2, 1990.

Decided Dec. 7, 1990.

As Amended Dec. 14, 1990.

Order on Petition for Rehearing
in No. 88–1241 Feb. 7, 1991.

Rehearing Denied in Nos. 88–1242
to 88–1244 Feb. 7, 1991.

Rehearing En Banc Denied in Nos. 88–1242
to 88–1244 Feb. 15, 1991.

Benicio Sanchez Rivera, San Juan, P.R., for defendant, appellant Jose Luis Latorre.

Peter John Porrata, Old San Juan, P.R., for appellant Carlos Ivan Latorre.

Benjamin S. Waxman, with whom William R. Tunkey and Weiner, Robbins, Tunkey & Ross, P.A., Miami, Fla., were on brief, for defendant, appellant Ferras-Lago.

Maria H. Sandoval, Santurce, P.R., for defendant, appellant Marrero-Figueroa.

Nina S. Goodman, Dept. of Justice, Washington, D.C., with whom Daniel F. Lopez-Romo, U.S. Atty., Hato Rey, P.R., for Puerto Rico, was on brief, for appellee.

Before BREYER, Chief Judge, BOWNES, Senior Circuit Judge, and ATKINS,* Senior District Judge.

BOWNES, Senior Circuit Judge.

During the morning of June 7, 1982, a tractor trailer belonging to Francisco Fuster Medina was stolen while en route from the Atari factory in Fajardo, Puerto Rico to the shipping terminal in Canovanas. It was carrying over 49,000 Atari video game cassettes. On June 3, 1987, eight individuals were indicted for the crime on two counts: one, conspiracy to rob approximately 49,546 Atari video game cassettes

---

* Of the Southern District of Florida, sitting by designation.

with an estimated value of $1,115,965 from Atari Caribe Inc. in violation of 18 U.S.C. § 1951(a), (b)(1) and (b)(3); and two, commission of a robbery in violation of 18 U.S.C. § 1951(a), (b)(1) and (b)(3).[1] Count two also alleged a violation of 18 U.S.C. § 2.

Trial proceeded against five defendants: Jose Luis Latorre, a/k/a "El Cano"; Carlos Ivan Latorre; Hector Giovani Hernandez Gomez; Antonio Marrero–Figueroa; and Ramon Ferras–Lago. Hector Giovani Hernandez Gomez pled guilty during trial. Jose Latorre, Carlos Latorre and Ferras were convicted on both counts. Marrero was convicted only on count one, the conspiracy count. All four defendants have appealed. The issues raised singly or collectively are: the sufficiency of the evidence; whether the indictment should have been dismissed; the admission of evidence of other tractor trailer thefts; ineffective assistance of counsel; the prosecution of Carlos Latorre despite a plea agreement; and the jury instructions. We affirm all convictions.

## THE EVIDENCE

We review the evidence in the light most favorable to the government, including all legitimate inferences to be drawn therefrom, to determine whether a rational trier of fact could have found defendants guilty beyond a reasonable doubt. *United States v. Blair*, 886 F.2d 477, 478 (1st Cir.1989).

The hijacking was carried out by a gang headed by Jose Luis Latorre. Four of the witnesses who testified had been members of the gang and three of them had been directly involved in the June 7 robbery.[2] In addition, there was testimony by one of the indicted defendants, Giovani, who pled guilty during the trial. The testimony of these witnesses was substantiated and corroborated by independent witnesses and circumstantial evidence.

Planning for the robbery started in May of 1982. One of the members of the gang, Edgardo Correa Davila, a/k/a Eggy, worked part time as a truck driver for the trucking company that hauled video game cassettes from the Atari factory in Fajardo to Canovanas for shipment to the United States.[3] Eggy, therefore, was able to advise Luis Latorre and Wilfredo Rivera Diaz as to the date and time when a trailer load of cassettes would leave the Atari factory for the shipping terminal. Rivera Diaz was not indicted and testified at the trial. He was a member of the hijacking gang; his chief function was to find buyers for the stolen merchandise. Two preliminary steps had to be taken before the robbery could take place: a buyer for the stolen merchandise had to be found, and a place where the

---

1. The pertinent sections of the statute state:
   (a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.
   (b) As used in this section—
   (1) The term "robbery" means the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property, or property in his custody or possession, or the person or property of a relative or member of his family or of anyone in his company at the time of the taking or obtaining.

   . . . . .

   (3) The term "commerce" means commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction.

2. The three witnesses who participated in the robbery were: Hector Manuel Lopez Cabrera, who had been indicted; Jorge Derieux Journet; and Wilfredo Rivera Diaz. Another witness, Marios Walters Rosales, was a member of the Latorre gang but did not participate in this robbery; he was, however, privy to its planning and knew where, when and how it was carried out.

3. At the shipping terminal, the trailer with its load of cassettes would be lifted on board a container ship for the voyage to the United States.

stolen trailer could be unloaded had to be located.

Giovani was put in charge of finding a place where the cassettes would be unloaded from the stolen van. He contacted a friend, defendant Marrero, who ran an automobile glass business and had a warehouse. Giovani told Marrero that he would like to use his warehouse to unload a trailer van of Ataris that was to be stolen. A price of $3,000 was agreed upon, $500 of which would be kept by Giovani. Marrero insisted that his warehouse could be used only for unloading the stolen trailer, that the merchandise could not be stored there.

Defendant Ferras agreed to be one of the principal buyers. Ferras met with Jose Latorre and Rivera Diaz prior to the robbery and said "he would swallow a van full of Pac–Man." He further stated to Latorre and Rivera Diaz that there would be no problem as to price for a van full of Atari cassettes. It was then definitely decided that the Latorre gang would hijack a trailer loaded with Pac–Man Atari cassettes.

After two false starts, due to the failure of the trailer to leave the factory as anticipated, the hijacking went forward on the morning of June 7, 1982. Those who did the hijacking were the Latorre brothers, Jose and Carlos, Jorge Derieux Journet, Edgardo Correa Davila, a/k/a Eggy, and Cesar Robles Gonzalez, a/k/a Jiggity. Derieux Journet and Lopez Cabrera were witnesses at the trial. Derieux and Lopez were assigned to a small white car, a Champ, that resembled a police cruiser. The car was equipped with a siren. Both men were given a police badge and a handgun. Lopez also was given a radio phone, similar to the kind the police used. The plan was as follows: Derieux would drive and Lopez would occupy the passenger seat. They would follow the tractor trailer and when they neared a suitable site for the robbery, the siren would be sounded. The white car would then draw abreast of the truck and signal the driver to stop. Lopez would display the badge and the radio phone so that the truck driver would think he was being stopped by the police.

The other three robbers, the Latorre brothers and Robles Gonzalez, would follow in another car.

All went according to plan. The driver of the hijacked vehicle testified that he heard what he thought was a police siren. Then, what apparently was a white police cruiser pulled alongside the truck. After seeing the badges and what looked like a police radio phone, the truck driver pulled over to the side of the road and stopped. He got out of the truck and was taking his license out of his pocket when a gun was pointed at him and he was ordered to get in the back of the white car. After he had done so, he was told to lie face down on the floor and warned that if he tried to look at the faces of his captors "he would easily get killed." After being held prisoner for about two hours, the driver was released and reported the hijacking to Fuster, owner of the truck. Fuster notified the police.

Meanwhile, the other three robbers took the trailer to the warehouse of defendant Marrero. Present at the warehouse, in addition to the Latorre brothers and Robles Gonzalez, were Giovani, defendant Marrero and someone called "Georgi." The cassettes were stacked on wooden pallets which were wrapped in plastic. Each plastic-wrapped bundle had color crayon markings on it. Giovani had furnished an Econoline van to which the Atari cassettes were transferred. As the transfer was made, the plastic wrappings were pulled off the pallets, and the plastic and pallets were discarded on the ground outside the warehouse.

When Carlos Latorre examined the shipping documents identifying the packaged cassettes, he discovered that there were no Pac–Man cassettes in the shipment. This caused some of the potential buyers to back away from purchasing the cassettes. Defendant Ferras was no longer interested in buying the bulk of the shipment, but he did buy 28,500 cassettes at an agreed price of $4 each, for a total of $114,000. Ferras, however, actually paid only $100,000. There were some small purchases by other buyers including Giovani. Thus, the million dollar heist contemplated by the Latorre gang became in fact a $100,000 bust.

This evidence, which in the main is an amalgam of the testimony of participants in the conspiracy and robbery, is more than sufficient to sustain the convictions of all appellants. We must add, however, that in addition to being corroborated by wives, mistresses and acquaintances of the defendants, the testimony was confirmed by a chain of evidence that was substantially immune from credibility attack.

After the owner of the stolen truck, Francisco Fuster, notified the police, he called a friend in the trucking business, Manny Rodriguez Roig, and told him that one of his tractor trailers had been stolen, described it, and asked him to call if he saw it. Defendant Marrero had contracted with a trucking company, the Los Vaqueros Cooperative, to do all the trucking for him. On June 7, Pedro Santiago Velazquez, a truck driver employed by Los Vaqueros, picked up a trailer loaded with automotive glass for delivery to Marrero's glass shop. When he got there, he parked in the front, partially on the sidewalk, and went into the glass shop. He was told to take the van to Marrero's warehouse, which was located some distance away. As he got into his truck, Rodriquez Roig, whom he knew, came by and told him that a truck and trailer had been stolen from Fuster. The truck and trailer were described to him. Santiago then drove to Marrero's warehouse where he saw a trailer that fitted the description he had been given of the one that had been hijacked. The next day he saw Rodriguez Roig and told him about the trailer he had seen at Marrero's warehouse. He and Rodriguez Roig went to the warehouse but the trailer was not there. Rodriguez Ruig called Fuster who notified the FBI. On the evening of June 8, Fuster, Rodriguez Roig and two FBI agents went to Marrero's warehouse. The agents looked in the warehouse but saw no trailer. They did, however, notice some plastic wrappings and wooden pallets on the ground outside the warehouse. They retrieved the plastic, which was subsequently identified as coming from the shipment of stolen Atari cassettes.

The evidence was overwhelming as to the planning and participation of Jose Latorre and Carlos Latorre in the robbery. It also more than suffices for the conviction of Ferras. Although he did not participate in the hijacking, the evidence shows that he agreed in advance to buy the bulk of the stolen merchandise. This made him part of the conspiracy. It was his promise "to swallow a van full of Pac–Man" that convinced the hijackers that this would be a profitable venture. Ferras purchased more than half of the cassettes for $100,000 after the robbery. Obviously, he was one of the key men in the illicit enterprise and was properly found guilty on both counts. Marrero's conviction on the conspiracy count is also solidly grounded in the evidence. As with Ferras, his role was a necessary prerequisite to the hijacking. Without a place for unloading the stolen merchandise, the robbery could not go forward. By agreeing before the robbery to rent his warehouse to the hijackers for $2,500, Marrero became part of the conspiracy.

## REFUSAL TO DISMISS INDICTMENT

After the government rested, defendant Marrero orally moved that the indictment be dismissed on the grounds of prosecutorial misconduct before the grand jury. The district court reserved ruling on the motion until after the jury returned its verdict. It then denied the motion holding that the jury verdict rendered harmless any prosecutorial misconduct. It also held that there was no prosecutorial misconduct. Marrero has appealed and some of the other defendants have piggy-backed the issue.

It is claimed that the indictment should have been dismissed because it was obtained "through abusive and improper presentations of evidence before the grand jury." Brief at 41. As we understand it, there are three grounds for the motion to dismiss. The first concerns reading the testimony of Carlos Latorre given before another grand jury to the grand jury that returned the indictments in this case. This was abusive and improper, defendant argues, because Latorre had breached a plea

6

agreement in another case by giving perjured testimony. Further, he asserts that the grand jury testimony of Latorre that Rivera Diaz was an active participant in the hijacking and went to Marrero's warehouse was contradicted by the trial testimony of Rivera Diaz. It also was clear, defendant maintains, that Latorre's grand jury testimony was false in three other respects. Defendant argues that it was improper to read this prior grand jury testimony to the indicting grand jury without informing the jurors that Carlos Latorre had perjured himself in another case, and that the testimony was false in certain respects.

The second attack focuses on the testimony of Rivera Diaz to a prior grand jury. Unlike Latorre's prior grand jury testimony, Rivera Diaz's prior grand jury testimony was not read to the indicting grand jury; Rivera Diaz testified before the indicting grand jury. Defendant alleges, and the government does not deny, that Rivera Diaz lied to the prior grand jury. Defendant asserts that Rivera Diaz's testimony before the indicting grand jury was "heavily relied on to obtain the indictment." He argues that the government had a duty to inform the indicting grand jury that Rivera Diaz had committed perjury in testifying before the prior grand jury.

Third, defendant claims that the government had a duty to present exculpatory evidence to the indicting grand jury. Interestingly, the exculpatory evidence, which defendant argues should have been disclosed, were two statements made by Rivera Diaz, the person whom defendant attacks as an unreliable grand jury witness. One of the statements was made to the prior grand jury, the other was made in an interview with FBI agents.

■ The challenge to the indictment was made after the close of the government's case. This violates Fed.R.Crim.P. 12(b)(1) and (2) which state:

(b) Pretrial Motions. Any defense, objection, or request which is capable of determination without the trial of the general issue may be raised before trial by motion. Motions may be written or

oral at the discretion of the judge. *The following must be raised prior to trial*:

(1) Defenses and objections based on defects in the institution of the prosecution; or

(2) Defenses and objections based on defects in the indictment or information (other than that it fails to show jurisdiction in the court or to charge an offense which objections shall be noticed by the court at any time during the pendency of the proceedings).

(Emphasis added). The failure to move to dismiss the indictment "prior to trial" ignores the clear command of the rule. If an indictment should be dismissed, dismissal should come before the defendant and the government have been put to the expense of a trial. Because, however, defendant has suggested that the grand jury material that forms the basis for its motion did not become available until after the trial had started, we will review the issue on its merits.

■ In light of Supreme Court precedent and cases decided by this circuit, there is no merit to defendant's claim that the district court erred in not dismissing the indictment. In *United States v. Mechanik*, 475 U.S. 66, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986), the Court held that an undisputed violation of Fed.R.Crim.P. 6(d)[4] was not grounds for overturning a conviction by the petit jury. The Court stated: "We believe that the petit jury's verdict of guilty beyond a reasonable doubt demonstrates *a fortiori* that there was probable cause to charge the defendants with the offenses for which they were convicted. Therefore, the convictions must stand despite the rule violation." *Id.* at 67, 106 S.Ct. at 940. The Court's holding is directly pertinent to this case:

We express no opinion as to what remedy may be appropriate for a violation of Rule 6(d) that has affected the grand jury's charging decision and is brought to the attention of the trial court before the commencement of trial. We hold only that however diligent the defen-

---

**4.** Two government witnesses testified in tandem before the grand jury.

dants may have been in seeking to discover the basis for the claimed violation of Rule 6(d), the petit jury's verdict rendered harmless any conceivable error in the charging decision that might have flowed from the violation. In such a case, the societal costs of retrial after a jury verdict of guilty are far too substantial to justify setting aside the verdict simply because of an error in the earlier grand jury proceedings.

*Id.* at 72–73, 106 S.Ct. at 942–943 (footnote omitted). In a subsequent case, *Bank of Nova Scotia v. United States,* 487 U.S. 250, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988), the Court expanded on *Mechanik,* holding that "as a general matter, a district court may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendants." *Id.* 487 U.S. at 254, 108 S.Ct. at 2373.

Because defendants's root claim is based on alleged incompetent grand jury evidence, *Costello v. United States,* 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956), also stands as a bar to dismissal of the indictment. In *Costello,* the Court held that inadequate or incompetent grand jury evidence was not grounds for quashing an indictment, stating: "An indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call for trial of the charge on the merits. The Fifth Amendment requires nothing more." *Id.* at 363, 76 S.Ct. at 409 (footnote omitted). *See also United States v. Calandra,* 414 U.S. 338, 345, 94 S.Ct. 613, 618, 38 L.Ed.2d 561 (1974).

Defendant's position is also squarely refuted by a solid line of First Circuit cases. In *United States v. Maceo,* 873 F.2d 1 (1st Cir.), *cert. denied,* — U.S. —, 110 S.Ct. 125, 107 L.Ed.2d 86 (1989), we reiterated the holding of *Costello,* stating: "A court should not inquire into the sufficiency of the evidence before the indicting grand jury, because the grand jury proceeding is a preliminary phase of the criminal justice process and all constitutional protections will be afforded during trial." *Id.* at 3. *United States v. Rivera–Santiago,* 872 F.2d 1073 (1st Cir.), *cert. denied,* — U.S.

—, 109 S.Ct. 3227, 106 L.Ed.2d 576, — U.S. —, 110 S.Ct. 105, 107 L.Ed.2d 68 (1989), summarizes the legal principles governing the dismissal of grand jury indictments:

It is well established that "[a]n indictment returned by a legally constituted and unbiased grand jury, ... if valid on its face, is enough to call for trial of the charge on the merits." *Costello v. United States,* 350 U.S. 359, 363, 76 S.Ct. 406, 409, 100 L.Ed. 397 (1956). *See Lawn v. United States,* 355 U.S. 339, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958). The Supreme Court has also held that an indictment returned by a legally constituted and unbiased grand jury "is not subject to challenge on the ground that the grand jury acted on the basis of inadequate or incompetent evidence." *United States v. Calandra,* 414 U.S. 338, 363, 94 S.Ct. 613, 627, 38 L.Ed.2d 561 (1974). The prosecutor before a grand jury is not normally under a duty to disclose exculpatory evidence. *United States v. Bucci,* 839 F.2d 825, 831 (1st Cir.), *cert. denied,* 488 U.S. 844, 109 S.Ct. 117, 102 L.Ed.2d 91 (1988); *United States v. Wilson,* 798 F.2d 509, 517 (1st Cir.1986). *See also United States v. Page,* 808 F.2d 723, 727–28 (10th Cir.), *cert. denied,* 482 U.S. 918, 107 S.Ct. 3195, 96 L.Ed.2d 683 (1987). Nor, contrary to what appellant infers, is the prosecutor obligated to impeach the credibility of his own witnesses. *Bucci,* 839 F.2d at 831. *See United States v. Smith,* 552 F.2d 257, 261 (8th Cir.1977); *cf. United States v. Calandra,* 414 U.S. at 344–45, 94 S.Ct. at 618–19.

*Id.* at 1087. We need go no further. Defendant's challenge to the indictment was properly rejected.

### ADMISSION OF EVIDENCE OF OTHER CRIMES

During the trial, there was testimony by Rivera Diaz that the "Latorre Gang," of which Rivera Diaz was a member, had planned and perpetrated a number of other hijackings. The trailers stolen contained an array of merchandise: tuna fish; thermos containers; hair spray; Parke Davis &

Warner Lambert drugs (three trailers); Alka Seltzer; Tylenol; Wrangler Jeans; batteries of different brands and types; and Gillette products. Rivera Diaz also testified that he had sold the stolen Gillette shipment to defendant Ferras, who knew it was stolen when he bought it. There was also testimony by Rivera Diaz that Ferras had bought the stolen shipment of Alka Seltzer for $25,000, with full knowledge that he was buying stolen merchandise.

■ There is a two-part test that must be met before evidence of past bad acts can be admitted. First, it must be shown that the evidence is not barred by Fed.R.Evid 404(b) which provides:

(b) Other crimes, wrongs, or acts.— Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

If it is found that the evidence is admissible for a purpose other than to show bad character, the second test is then implicated. It involves the application of Fed.R.Evid. 403, which provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

For a full exposition of the "prior bad acts" test and citations to pertinent First Circuit cases see *United States v. Ferrer–Cruz,* 899 F.2d 135, 137–38 (1st Cir.1990).

Defendants, especially Ferras, argue strenuously that the evidence was unfairly prejudicial and misled the jury.

The district court applied the test before admitting the evidence. After the evidence was admitted, the jury was instructed: that it could consider the evidence only as to the Latorre brothers and Ferras; that the evidence could not be used to prove that "the three defendants did the acts charged in this case"; that the evidence could be used only to prove defendants' state of mind, modus operandi, planning, knowledge and necessary intent. A similar but shorter instruction was given a short time later which was specifically limited to defendant Ferras. In the final charge to the jury, the court instructed the jury again on how the evidence of the prior hijackings could be used.

■ The standard of review for the admission of prior bad acts evidence is abuse of discretion. *United States v. Ferrer–Cruz,* 899 F.2d at 138; *United States v. Rodriguez–Estrada,* 877 F.2d 153, 155–56 (1st Cir.1989). The only possible problem with the admission of the evidence against the Latorre brothers was overkill. The jury might have been tempted to find the defendants Latorre guilty merely because of the great number of other hijackings they had carried out. As previously noted, however, the evidence against the Latorres in this case was overwhelming. The testimony about the prior trailer thefts, if believed, established beyond any doubt that the Latorres had the experience, skill, knowledge and resources to plan and carry out a successful hijacking. It was, therefore, admissible under Fed.R.Evid. 404(b), and we find that it was not unfairly prejudicial. The three limiting instructions to the jury effectively dampened any potential for unfair prejudice.

■ The next question is the admission of evidence, which if believed, showed that Ferras had, on two prior occasions, purchased two shipments of stolen merchandise knowing that it had been stolen by the Latorre gang. Ferras' argument hinges on his defense that he had nothing to do with the Atari robbery. In *United States v. Oppon,* 863 F.2d 141, 146 (1st Cir.1988), we held that "other acts evidence may be admitted when it is probative of an issue other than character even when the defense is a general denial of the charges." We have held that in a conspiracy prosecution "evidence of similar past crimes or wrongful acts may be especially appropriate" because in a conspiracy case "knowing participation and intent is an issue of crucial import." *United States v. Scelzo,* 810 F.2d 2, 4 (1st Cir.1987); *see also United States v. Zeuli,* 725 F.2d 813, 816 (1st Cir. 1984). Testimony that on two prior occasions Ferras had purchased merchandise that had been taken from trailers hijacked by the same gang from which he had purchased part of the shipment stolen in this case was admissible to prove that Ferras had knowingly and intentionally participated in the conspiracy to hijack the Atari tractor trailer. This evidence, of course, was prejudicial to Ferras, but it was not

unfairly prejudicial. There was evidence that Ferras had agreed with Jose Latorre and Rivera Diaz prior to the hijacking to purchase the lion's share of the Ataris that the Latorre gang planned to steal. The district court properly admitted the evidence of prior hijackings and Ferras' participation as a "fence" in two of them.

## INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant Jose Latorre claims that his attorney's trial representation was so deficient as to deprive him of his constitutional right to a fair trial. We do not decide this issue because it was not raised in the district court. Except in unusual circumstances, we will not decide a claim of inadequate representation that has not been first made to the district court. *United States v. Sanchez*, 917 F.2d 607–612 (1st Cir.1990); *United States v. Paz Uribe*, 891 F.2d 396, 398 (1st Cir.1989), *cert. denied*, — U.S. ——, 110 S.Ct. 2216, 109 L.Ed.2d 542 (1990); *United States v. Costa*, 890 F.2d 480, 482–83 (1st Cir.1989); *United States v. Hoyos–Medina*, 878 F.2d 21, 22 (1st Cir.1989); *United States v. Carter*, 815 F.2d 827, 829 (1st Cir.1987).

In *United States v. Sanchez*, we explained the reasons for the rule:

There are two sound reasons for the rule. First, the reviewing court benefits from careful preliminary consideration by the trial judge, who is better situated to appraise defense counsel's representation in the district court proceedings. *See, e.g., Hoyos–Medina*, 878 F.2d at 22. Second, "ineffective assistance" claims normally require "the resolution of factual issues as well as inquiries into other evidentiary matters that cannot effectively be handled for the first time by a court of appeals." *See Costa*, 890 F.2d at 483. "[W]hile some ineffective assistance claims might be capable of presentation solely on the record of the criminal trial itself, most such claims require the independent development of evidence outside of, and collateral to, the criminal proceedings." *Brien v. United States*, 695 F.2d 10, 13 (1st Cir.1982). Usually these claims are better left to collateral review under 28 U.S.C. § 2255. *See Costa*, 890 F.2d at 483.

At 612–13. Although the government has addressed the issue on its merits, neither party has advanced any reason for bypassing the district court.

## PROSECUTION OF CARLOS LATORRE DESPITE PLEA AGREEMENT

This issue was expressly dealt with and decided in *United States v. Gonzalez–Sanchez*, 825 F.2d 572 (1st Cir.), *cert. denied*, 484 U.S. 989, 108 S.Ct. 510, 98 L.Ed.2d 508 (1987). Latorre is not entitled to another appeal on the plea agreement issue. We set forth the underlying facts. In 1984, Latorre made a plea agreement with the government. He agreed to plead guilty to conspiring to steal and stealing an interstate shipment of merchandise. Latorre also agreed to cooperate fully in the investigation and prosecution of two arson cases involving members of the Latorre gang. The government's *quid pro quo* was that it would not prosecute Latorre for his role in "other known and unknown thefts from interstate shipments" and "known arson for profit/fraud against insurance schemes."

In a subsequent case, the district court found, after a hearing, that Latorre had violated the plea agreement by failing to testify honestly at the trial of one of the arson cases. He was, thereafter, made one of the defendants in *United States v. Gonzalez–Sanchez* and was convicted. In appealing his conviction, Latorre raised the same arguments that he does now: that the trial court's finding that he breached the plea agreement was based on inadmissible and insufficient evidence; and that he was entitled to a jury trial on the question of whether he breached the plea agreement. On appeal, we explicitly refuted these contentions and upheld the district court's finding that Latorre had breached the plea agreement. *Gonzalez–Sanchez*, 825 F.2d at 577–79. We refuse to consider again Latorre's contentions on the plea agreement.

## THE JURY INSTRUCTIONS

Two defendants, Ferras and Marrero, have appealed the jury instructions. The other two defendants, the Latorres, have adopted their objections. We first consider the issues raised by Ferras. He has two claims. The first is that the court failed to instruct the jury that in order to find him guilty of conspiracy, it had to find beyond a reasonable doubt that Ferras intended to commit the charged robbery. Ferras focuses on the following part of the conspiracy instruction:

In deciding whether defendants whom you are considering or any of them was

in fact a member of the conspiracy, you should consider whether based upon all the evidence it appears that the defendant willinguly [sic] and knowingly joined the conspiracy. Did a defendant participate in it with knowledge of *his* unlawful purpose and with the specific intention of furthering *his* business or objective and associate or worker.

(Emphasis ours). He argues that this instruction advises the jury that a participant in a conspiracy must have the intent of furthering his own business or objective, not that the participant must intend to further the object of the conspiracy.

We find that the use of the word "his" instead of "its" was unfortunate, not fatal. We review the charge as a whole, not an isolated excerpt from it. *Cupp v. Naughten,* 414 U.S. 141, 146–47, 94 S.Ct. 396, 400–01, 38 L.Ed.2d 368 (1973); *United States v. Boylan,* 898 F.2d 230, 244 (1st Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 139, 112 L.Ed.2d 106 (1990); *United States v. Twomey,* 884 F.2d 46, 52 (1st Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 2592, 110 L.Ed.2d 273 (1990). The targeted excerpt was followed immediately by this admonition:

In that regard, you are to decide that question. In that regard, it has been said that in order for a defendant—and you must decide that based upon the evidence in the case—in that regard it has been said that in order for a defendant to be deemed a participant in a conspiracy, he must have had a stake in the venture or its outcome.

A short time later, the court gave this instruction:

The key question, therefore, is whether the defendants joined the conspiracy with an awareness of at least some of the basic aims and purposes of the unlawful agreement.

Considering the charge as a whole, as we must, and construing its language in a common-sense manner, we find that the jury was properly instructed on the factors necessary for a finding that defendants, including Ferras, participated in a conspiracy to hijack a tractor-trailer load of Atari cassettes.

Ferras also complains that the instructions were "unclear, confusing and virtually incomprehensible." We have read the entire charge carefully. There is no basis for this assertion. The instructions by the district court covered the issues properly, completely and clearly.

Defendant Marrero's objections need not long detain us because they run afoul of Fed.R.Crim.P. 30 which provides in pertinent part:

No party may assign as error any portion of the charge or omission therefrom unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which that party objects and the grounds of the objection.

At the bench conference following the charge, the attorney for Marrero stated:

I'd like the record to reflect that my objection is to the extent that my instructions filed on behalf of Mr. Marrero on October 16 were not read to the jury. I take exception to the court's instructions.

I'd also like the record to reflect that four additional instructions numbered 40 through 43 were submitted to the court and I understand that two of them were rejected.

We do not think this comports with the rule, which requires that the matter to which the party objects be stated distinctly. *See United States v. Noone,* 913 F.2d 20, 29 (1st Cir.1990); *United States v. Boylan,* 898 F.2d at 249. Our review, therefore, is limited to plain error. *United States v. Waldeck,* 909 F.2d 555, 561 (1st Cir.1990); *United States v. Thomas,* 895 F.2d 51, 55 (1st Cir.1990). As already indicated, we have found no error in the charge, plain or otherwise.

We have considered all other objections raised directly or inferentially by defendants and find them without merit.

The convictions of all defendants are AFFIRMED.

## ORDER ON PETITION FOR REHEARING

### Feb. 7, 1991

Defendant claims that we erred in finding that the issue of competency of counsel was not raised in the district court. It is true that defendant requested during trial that either another lawyer be appointed or that defendant be allowed to conduct his own defense. The district court rejected the request, stating: "Mr. Segarra has displayed diligence, professional competence, and is representing this defendant ably. . . ."

Normally, a claim of incompetency of counsel is brought after trial in the district

court via a petition pursuant to 28 U.S.C. § 2255. This allows the district court to hold a hearing, if it wishes, after reviewing the trial record. The post-trial procedure protects a defendant because it ensures him of an objective reasoned decision, not one made during the heat of trial.

Because, however, defendant wishes to forego the 28 U.S.C. § 2255 procedural route and requests a ruling from us on his claim that his counsel's trial performance was so incompetent as to deprive him of constitutional right to a fair trial and because the government has briefed the issue, we will now rule on defendant's claim.

Based on our complete and careful review of the record and giving due deference to the findings of the district court on this issue, we find that there is no merit to defendant's claim.

The petition for rehearing is denied.