# United States Court of Appeals
## For the First Circuit

---

Nos. 00-1739, 00-1813

UNITED STATES OF AMERICA,

Appellee,

v.

VINCENT MICHAEL MARINO, A/K/A GIGI PORTALLA, AND
JOHN J. PATTI III,

Defendants, Appellants.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

---

Before

Boudin, Chief Judge,
Coffin, Senior Circuit Judge,
and Lynch, Circuit Judge.

---

Robert L. Sheketoff with whom Sheketoff & Homan was on brief for appellant Vincent Marino.
Terrance J. McCarthy for appellant John J. Patti III.
Cynthia A. Young, Assistant United States Attorney, with whom James B. Farmer, United States Attorney, was on brief for appellee.

January 14, 2002

**LYNCH, Circuit Judge**. Vincent Marino, a/k/a Gigi Portalla, and John Patti were members of La Cosa Nostra. They appeal their convictions under the Racketeer Influenced and Corrupt Organizations statute (RICO), 18 U.S.C. §§ 1961-1968 (1994 & Supp. V 1999) and the Violent Crimes in Aid of Racketeering statute (VICAR), 18 U.S.C. § 1959 (1994).

RICO has proven to be a powerful weapon in the government's efforts against organized crime. And so it was here. The government's theory described internecine warfare within the Patriarca Family of La Cosa Nostra, a group engaged in criminal activity, including drug distribution. The activities of the Patriarca Family have been chronicled in this court for more than a decade, including in United States v. Angiulo, 847 F.2d 956 (1st Cir. 1988). See also United States v. Barone, 114 F.3d 1284 (1st Cir. 1997); United States v. Angiulo, 57 F.3d 38 (1st Cir. 1995); United States v. Carrozza, 4 F.3d 70 (1st Cir. 1993); United States v. Patriarca, 948 F.2d 789 (1st Cir. 1991); United States v. Zannino, 895 F.2d 1 (1st Cir. 1990).

The relevant events span the years from 1989 through 1994. The Patriarca Family fractured into rival factions, the Salemme faction and the Carrozza faction, each seeking to seize control. Each took steps to eliminate members of the other, by murder or, at least, injury. Marino and Patti, the defendants here, were members of the Carrozza faction. They have each been sentenced to imprisonment for

-3-

more than 30 years.  These appeals raise a multitude of issues, including challenges to jurors, evidentiary rulings, jury instructions, and sentencing issues.

I.

The first trial of Marino and Patti ended in acquittals on several counts,[1] and their mistrial on the remaining counts.  Marino and Patti argued those acquittals foreclosed further prosecution.  This court rejected those contentions.  United States v. Marino, 200 F.3d 6 (1st Cir. 1999).

The second trial concluded with Marino and Patti being convicted of participating in a pattern of racketeering activity in violation of RICO, 18 U.S.C. § 1962(c) (substantive RICO violation) (Count One); conspiring to participate in a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d) (RICO conspiracy) (Count Two); and conspiring to murder thirteen named individuals in aid of racketeering in violation of 18 U.S.C. § 1959 (VICAR) (Count Three).  Patti was also convicted of conspiring to distribute narcotics in

---

[1]  Both defendants were acquitted of Count Four (using and carrying firearms in relation to the conspiracy to murder thirteen individuals in violation of 18 U.S.C. § 924(c)) and Count Thirty-one (using and carrying firearms in relation to the drug trafficking conspiracy in violation of 18 U.S.C. § 924(c)).  Patti was also acquitted of Count Fifteen (using and carrying firearms in relation to the attempted murder of Michael Prochilo in violation of 18 U.S.C. § 924(c)).

violation of 21 U.S.C. § 846.  Marino was sentenced to a total of 420 months in prison, while Patti was sentenced to 360 months in prison.

The substantive RICO and RICO conspiracy counts required the defendants to be found guilty of at least two racketeering acts or predicate acts.  18 U.S.C. § 1961(5).  The jury found Marino and Patti had committed the predicate acts of conspiracy (under state law) to murder thirteen individuals, and of conspiracy (under federal law) to sell illegal drugs in violation of 21 U.S.C. § 846.

## II.

Taking the evidence in favor of the verdict, the jury could have found the following facts.[2]

Marino and Patti were members of the Patriarca Family of La Cosa Nostra, an organization that controlled much of the crime in the greater Boston area.  In 1989 a conflict developed when a faction led by Robert Carrozza, Joseph Russo, and Vincent Ferrara began to challenge Raymond Patriarca's leadership of the organization.  In 1989 William Grasso, one of the leaders of the Patriarca Family, was killed.  An attempt was also made to murder Frank Salemme, who was at that time in the Patriarca Family leadership.  Marino was involved in the murder attempt and had reason to fear Salemme would return the favor.

_____

[2]     Much of the evidence in this case consisted of testimony by cooperating witnesses about statements by the defendants and their coconspirators.  Our discussion of the facts does not describe who said what to whom, but proceeds on the assumption that the jury generally credited both the witnesses and the declarants.

In 1991 Salemme became the boss of the Partriarca Family. The conflict escalated. On one side was the leadership of the Patriarca Family, and on the other side was the rival Carrozza faction, to which Marino and Patti belonged. Both factions wanted to collect the extortion payments to the Patriarca Family and control its other business.

Anthony Ciampi, a key Carrozza faction member, owned a club on Bennington Street in East Boston, the site of gambling and illegal card games. Carrozza faction members frequented the club. Mark Spisak, a Carrozza faction member, worked there. Marino was seen at least once at the club by John Arciero, a government witness.

In the Fall of 1993 there was a confrontation at the Breeds Hill Club in East Boston when Stephen Rossetti, a Salmme faction member, with Joseph Souza, Richard Devlin, and Richard Gillis present, shook down Ciampi. Months later, Ciampi would kill Devlin. Rossetti would die a natural death.

In early 1994 Marino and Patti conspired with others to help Carrozza challenge Salemme's leadership of the Family. As part of the conspiracy, Ciampi, accompanied by Spisak and Nick Patrizzi, murdered Devlin on March 31, 1994. Devlin had been attempting to extort money from Ciampi's gaming operations. Devlin's killers also attempted to murder Gillis. Both victims belonged to the Salemme faction. The murder of Devlin and the attempt to murder Gillis took place after

Ciampi saw Devlin, Gillis, and Stephen Rossetti in the vicinity of his club, "rubberneck[ing]" him earlier in the day. Ciampi believed that the three men were looking to kill him.

After Devlin's murder the Carrozza faction met more frequently at Ciampi's club, which became the center of operations. The group also stored weapons and surveillance equipment (such as night vision binoculars) there. Marino and Patti participated in a number of these meetings. The group talked about collecting envelopes of "rent" payments and taking over the city once they had killed Salemme and his allies.

After the Devlin murder and before August 1994, members of the Carrozza faction, including Michael Romano, Ciampi, Spisak, Ralph Scarpa, Enrico Ponzo, Marino, and Patti, met at Santarpio's, a restaurant in East Boston. Ciampi boasted of killing Devlin and asked who was going to do what next. The group discussed the need to eliminate their enemies and, specifically, their plans to kill Mark and Stephen Rossetti, Gillis, and Darin Buffalino, all members of the Salemme faction. After the meeting Romano told Spisak that Carrozza had told Romano that he had "a lot of faith in [Marino]."

During this period, between March 31 and August, 1994, a "peace" meeting took place between the warring factions at Kelly's Pub in Central Square in East Boston. Robert Luisi Jr. and Stephen Rossetti (Salemme faction members) met with Romano (from the Carrozza

-7-

faction) to discuss Devlin's murder and a proposed truce. Luisi and Rossetti told Romano that the reason Devlin, Gillis, and Stephen Rossetti had been in the vicinity of Ciampi's club on the day Devlin was killed was to look for Marino, whom they suspected was involved in the attempted murder of Salemme in 1989.

There was no peace. On September 1, 1994, Michael Romano Jr. was murdered. Both Romano Jr. and his father, Romano Sr., were Carrozza stalwarts. At a Northgate Mall meeting, the Carrozza group, with Marino in attendance, discussed who was responsible for the murder, and initially focused on Joseph Cirame and Enrico Ponzo. They also suspected several members of the Salemme faction, including Cirame, Joseph Souza, David Clark, Lonnie Hilson, and Frank Salemme. The murder of Romano Jr. intensified the warfare.

The Carrozza faction developed a "hit list" of people to kill. Their hit list included known Salemme faction members and those believed responsible for killing Romano Jr. The defendants and others participated in several excursions to locate and shoot people on the hit list. The excursions started and ended at the Ciampi club.

At a meeting at the club, Arciero, Romano, Sean Cote, Scarpa, Paul DeCologero, Marino, and Patti discussed a plan to kill Salemme at an auto body shop in Somerville. They wanted both to avenge Romano's murder and to take over the Patriarca Family operation. At another meeting, Romano, Arciero, Cote, DeCologero, Scarpa, Gino Rida, Marino,

and Patti planned to kill Lonnie Hilson in Everett because Hilson was "with Salemme."

In September 1994, Carrozza faction members twice attempted to murder Joseph Cirame, whom Romano Sr. suspected in the murder of Romano Jr. The first attempt failed; during the second, on September 16, Cirame was shot several times, but survived.

On September 21, 1994, Cote, while in a car driven by Patti, opened fire on Michael Prochilo, who was in his own car. Prochilo, who was in the Salemme faction, had stolen drugs from Patti. He was not hit.

On September 25, 1994, Cote stabbed Timothy Larry O'Toole in the arm because O'Toole was in the Salemme faction.

On October 13, 1994, several members of the Carrozza faction unsuccessfully attempted to murder Stephen Rossetti outside his home. This was only one of numerous attempts to kill Rossetti.

On October 20, 1994, Romano Sr. shot and killed Joseph Souza. Romano acted both to avenge his son's death and as part of the larger struggle between the factions. There was no evidence that Marino was a direct participant in Souza's murder.

Sometime in late 1994, Marino, Patti, and Cote broke into a doughnut shop in Central Square, East Boston. They stole both cash and guns for use by the faction and stored the guns with the cache of weapons already at Ciampi's club.

In addition, at least from the Fall of 1993 through the Fall of 1994, the Patriarca Family, including Patti and Marino, was involved in a cocaine distribution operation. Participants in this operation supplied drugs to other members of the Patriarca Family for distribution and sale, and for personal use.

## III.

On appeal, Marino and Patti raise a myriad of issues. We list them here in the order in which they are addressed.

(1) Peremptory Challenges to Venire: Patti claims that the trial court committed reversible error when it allowed the prosecutor, in violation of the Equal Protection and Due Process Clauses, to use his peremptory challenges to strike what Patti says was every Italian-American surnamed juror from the jury.

(2) Exclusion of Witnesses: Marino claims that the district court violated his Sixth Amendment right to present a defense when it refused to allow him to call certain witnesses to impeach the testimony of prosecution witnesses.

(3) Coconspirators' Statements: Marino and Patti challenge the admission of coconspirator statements admitted pursuant to Federal Rule of Evidence 801(d)(2)(E), because they claim the declarants were members of a warring faction and so could not be their coconspirators within the meaning of the Rule.

(4) RICO Enterprise: Marino attacks the sufficiency of the evidence to establish the requisite nexus under 18 U.S.C. § 1962(c) between the alleged enterprise -- the Patriarca Family -- and the predicate act -- the drug trafficking conspiracy.

(5) Jury Instructions: Marino appeals several of the trial court's jury instructions:

(a) Massachusetts Law, Aiding and Abetting a Conspiracy -- Marino says that the court erred in instructing the jury about aiding and abetting a conspiracy because Massachusetts law does not recognize the crime of aiding and abetting a conspiracy.

(b) Multiple-Object Conspiracy -- Marino contends that the court diluted the government's burden of proof by instructing the jury that he could be found guilty of the conspiracy to murder thirteen individuals if he agreed to murder at least one of them and had the foresight or knowledge of the broader scope of the conspiracy.

(c) Unanimity Instruction -- Marino argues that the court should have instructed the jury that it had to be unanimous about which of the thirteen people Marino agreed to murder.

(d) Instructions on Elements of Substantive RICO Violation -- Marino challenges the trial court's instructions as to three elements of RICO: the "employed or associated with" element, the "conduct and participate in the conduct of the affairs of the enterprise" element, and the interstate commerce element.

(e) Rejected Instruction on Credibility of Rule 801(d)(2)(E) Declarants -- Marino argues that the court erred when it refused to instruct the jury on assessing the credibility of nontestifying declarants whose testimony was admitted pursuant to an exception to the hearsay rule.

(6) Sentencing Issues: Marino makes two challenges to his sentence.

(a) Consideration of Souza's Murder -- Marino argues that the sentencing court should not have taken into account the murder of Souza when sentencing him, because the jury did not specifically find beyond a reasonable doubt that Marino participated in the murder of Souza, but rather found that he conspired to murder thirteen named individuals, including Souza.

(b) Apprendi Error -- Marino attacks his sentence because he claims it violated the Supreme Court's holding in Apprendi v. New Jersey, 530 U.S. 466 (2000).

(7) Double Jeopardy: Marino argues that his sentence violated the Double Jeopardy Clause because he was sentenced for both a substantive RICO violation and a RICO conspiracy, and because the VICAR violation is a lesser included offense of the substantive RICO violation.

Defendants have been very ably represented but their arguments do not prevail. We outline some of the significant rulings of law in this opinion.

1) We hold on the facts of this case that statements made by defendants' fellow members of a larger conspiracy in furtherance of that larger conspiracy are admissible as coconspirator statements under Rule 801(d)(2)(E), even when the declarants are members of an opposing faction fighting over control of the larger conspiracy.

2) We interpret the "through a pattern of racketeering activity" requirement under RICO, and hold that a sufficient nexus for the purposes of a substantive RICO violation under 18 U.S.C. § 1962(c) exists between the racketeering acts and the enterprise when the defendant was able to commit the predicate acts by means of, by consequence of, by reason of, by the agency of, or by the instrumentality of his membership in the enterprise.

3) We hold that the jurisdictional requirement of both RICO and VICAR require only that the crime have some effect on interstate commerce.

4) We hold that a substantive RICO violation under 18 U.S.C. § 1962(c) and a RICO conspiracy under 18 U.S.C. § 1962(d) are not the same offense for the purposes of double jeopardy analysis, and can therefore be punished separately.

We address each issue in turn.

1. Peremptory Challenges to Venire

(Patti)

Patti contends that the prosecutor's use of four peremptory challenges to eliminate Italian-American surnamed individuals from the jury violated the constitutional guarantee of equal protection. Batson v. Kentucky, 476 U.S. 79, 89 (1986). More specifically, he claims that the district court's failure to hold a hearing to inquire into the prosecutor's use of the peremptory challenges was erroneous.

During voir dire, the government used its peremptory challenges on Bradley Cordeiro, Alexander Innamorati, Jacquelyn Mascetta, and William Rosati. The defendant objected to these peremptory challenges stating that the government was trying to eliminate all Italian-American surnamed individuals from the jury. The trial court overruled the objection.

Since Batson it has been clear that criminal defendants may assert a right to jury selection procedures that forbid the government from eliminating "potential jurors solely on account of their race." Id. at 89. Batson established a three-part framework to ascertain whether the prosecution employed a race-based peremptory strike. Id. at 96-98. In the first step, the defendant must make a prima facie showing that the strike appeared discriminatory. If such a showing is made, the burden shifts to the government, which must advance a neutral explanation for the strike. Lastly, the district court must "determine if the defendant has established purposeful discrimination" or if the government's explanation is valid. Id. at 98.

-14-

To make a prima facie showing, the defendant must show that the strike was used on a juror who is a member of a "cognizable . . . group," Angiulo, 847 F.2d at 984, that "[has] been or [is] currently subjected to discriminatory treatment." United States v. Bucci, 839 F.2d 825, 833 (1st Cir. 1988).[3] The question is not whether members of the relevant group see themselves as part of a separate group, but rather "whether others, by treating those people unequally, put them in a distinct group." Id. (emphasis omitted). Whether such a group exists is a question of fact. Id. In both Angiulo and Bucci, this court rejected Batson claims on the basis that there was no evidence that Italian-Americans were such a group. Angiulo, 847 F.2d at 984; Bucci, 839 F.2d at 833. So too here.

Patti's claim fails for two reasons. First, he did not show that Italian-Americans or Italian-American surnamed people are a group that faced or faces systematic discrimination. Second, he did not show that the challenged jurors were in fact Italian-Americans or even that

---

[3]    Angiulo also held that "to make out a prima facie case of purposeful discrimination under Batson, the defendants must be members of the ethnic or racial group that they contend was discriminated against by the government." 847 F.2d at 984; see also Bucci, 839 F.2d at 833 n.12 ("We also note that neither appellant presented evidence that 'he is a member of [the Italian-American] group.'" (quoting Batson, 476 U.S. at 96) (alteration in original)). This rule is no longer good law. See Powers v. Ohio, 499 U.S. 400, 415 (1991) ("[A] defendant in a criminal case can raise the third-party equal protection claims of jurors excluded by the prosecution because of their race."); see also Chakouian v. Moran, 975 F.2d 931, 932-34 (1st Cir. 1992) (discussing the effect of Powers).

all their surnames were Italian-American.  <u>United States</u> v. <u>Sgro</u>, 816 F.2d 30, 33 (1st Cir. 1987) ("[Defendant] offered no evidence showing what surnames are 'Italian-American' or demonstrating the relationship between surnames and ethnicity.").  Because Patti failed to make a prima facie showing, the district court acted appropriately in not holding a hearing on the matter.  <u>See</u> <u>Bucci</u>, 839 F.2d at 832.

2. <u>Exclusion of Witnesses</u>

(Marino)

Marino argues that the trial court's refusal to allow him to call particular witnesses to impeach the testimony of prosecution witnesses violated his Sixth Amendment right to present a defense.  The court did not allow him to call Trooper Michael Grassia, John Mele's relatives, Anthony Penta, or Everett Frazier to impeach the testimony of John Mele and Mark Spisak.

Mele was the government's primary witness as to Marino's involvement in the 1989 attempted murder of Frank Salemme -- one of the alleged RICO predicate acts.  The defense claims that "Mele attempted to paint himself as a nonviolent mid-level drug dealer who never really made any money; and, who was recruited at the last second to participate in the Salemme shooting in 1989, agreeing only because he was hitching his wagon to the defendant."  The defense sought to impeach Mele by showing that he was a violent, high-level, very wealthy

-16-

drug dealer.  Marino sought to introduce the testimony of Trooper Grassia that when he questioned Mele in 1987 about weapons and bulletproof vests seized from Mele's apartment, Mele said he kept the weapons to use when he stole cocaine or money from other drug dealers. Marino also sought to introduce the testimony of Mele's relatives about Mele's accumulation of weapons and wealth.  In addition, Marino sought the testimony of Anthony Penta that Mele attacked and almost killed him over jewelry which Mele believed Penta had stolen from him.  The trial court excluded the testimony of these witnesses as mere impeachment of Mele's testimony, not in compliance with Fed. R. Evid. 608(b).

The other excluded testimony went to the impeachment of Mark Spisak, who testified for the government that he was in the car with Anthony Ciampi when Ciampi fired fatal shots at Devlin.  Marino sought to introduce the testimony of Everett Frazier, Spisak's nephew, to testify that Spisak had told him that he shot Devlin himself.  The trial judge excluded the Frazier testimony as a collateral matter used only for impeachment.

We review questions of admissibility of evidence for abuse of discretion. United States v. Gilbert, 181 F.3d 152, 160 (1st Cir. 1999).  We find none here.  The evidence falls into the category of impeachment of a witness on a collateral matter through extrinsic evidence.  Generally, a party may not present such evidence. United States v. Beauchamp, 986 F.2d 1, 3 (1st Cir. 1993).  A matter is

-17-

collateral if "the matter itself is not relevant in the litigation to establish a fact of consequence, i.e., not relevant for a purpose other than mere contradiction of the in-court testimony of the witness." Id. at 4 (quoting 1 McCormick on Evidence 169 (4th ed. 1992)) (internal quotation marks omitted). Whether something is collateral is within the discretion of the trial judge. United States v. Mulinelli-Navas, 111 F.3d 983, 988 (1st Cir. 1997).

Nevertheless, extrinsic evidence to disprove a fact testified to by a witness may be admissible if the trial judge deems that it satisfies the Rule 403 balancing test and it is not excluded by another rule. One such rule of exclusion is Rule 608(b): "Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime . . . may not be proved by extrinsic evidence." Some of the proffered testimony went to the conduct of the witnesses and so was properly excluded under Rule 608(b). As to the rest, the trial judge did not abuse his discretion in concluding that it was collateral.

Grassia's proposed testimony would have been about Mele's position as a drug dealer, which was not relevant to Marino's guilt or innocence. The same was true of the evidence from Mele's relatives. Similarly, Frazier's testimony as to who murdered Devlin could be viewed as collateral. Marino was not accused of murdering Devlin.

Exactly who killed Devlin (that is, Ciampi or Spisak) was not at issue so long as the person was part of the charged conspiracy.

Finally, Mele was extensively cross-examined on the fact that he was a drug dealer, that he was arrested and his apartment searched, that he kept weapons in this apartment, that he owned property, and that he fought with Penta over the stolen jewelry.  Spisak was also cross-examined about his role in the murder of Devlin.  There was no violation of a constitutional right to cross-examine.


## 3. Coconspirators' Statements (Rule 801(d)(2)(E)) (Marino and Patti)

Marino and Patti both argue that the district court erred when it admitted hearsay evidence based on the coconspirators' statements exception to the hearsay rule.  Fed. R. Evid. 801(d)(2)(E). Specifically, they object to the admission of authorized surveillance tape recordings of a December 11, 1991 conversation between Frank Salemme, Natale Richichi, and Kenneth Guarino which took place at a Hilton hotel (the "Hilton tapes").  The conversation was a general discussion about the Patriarca Family and its business: the members of the Family, the structure, and the activities of the organization.  The government used the tapes to show that the Patriarca Family existed and that it engaged in illegal activities.  The defense theory is that the three men whose conversation was recorded were part of the rival

-19-

Salemme faction and so could hardly be the defendants' coconspirators, and therefore the evidence is inadmissible.

In addition, Marino contends that statements made by Bobby Luisi Sr. and Stephen Rossetti (introduced through the testimony of Mark Spisak and Jerry Matricia) were inadmissible on the same grounds. It is unclear to which statements Marino is referring; it appears that he means statements made by Luisi and Rossetti that the reason Devlin, Rossetti, and Gillis were in the area of Ciampi's club the night Ciampi shot Devlin was to kill Marino in retaliation for his attempted murder of Salemme in 1989, and not to kill Ciampi (as Ciampi believed). These Luisi and Rossetti statements were made during a meeting between representatives of the two factions who were trying to ease the tension in the factional dispute.

Under Rule 801(d)(2)(E), "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy" is not hearsay. Patti and Marino argue that because the statements were made by members of a faction which was at war with their faction, there was no unity of interest between them, so the statements could not have been made by coconspirators.

This argument raises issues of law and of fact. We review the trial court's determination that statements were coconspirator statements under the clear error standard. United States v. Mojica-Baez, 229 F.3d 292, 304 (1st Cir. 2000), cert. denied, 121 S. Ct. 2215

-20-

(2001). To admit a statement under the coconspirator exception, the government must show by a preponderance of the evidence that the defendant and declarant were in the same conspiracy, and that the statement was made "during the course and in furtherance of the conspiracy." Bourjaily v. United States, 483 U.S. 171, 175 (1987) (quoting Fed. R. Evid. 801(d)(2)(E)); United States v. Ciampaglia, 628 F.2d 632, 638 (1st Cir. 1980).  The rule is that

> [a]s long as it is shown that a party, having joined a
> conspiracy, is aware of the conspiracy's features and
> general aims, statements pertaining to the details of plans
> to further the conspiracy can be admitted against the party
> even if the party does not have specific knowledge of the
> acts spoken of.

Angiulo, 847 F.2d at 969.  In addition, the improper admission of such testimony is subject to harmless error analysis.

While defendants' arguments make some sense, they run afoul of well established law about admission of coconspirators' statements. To the extent that defendants seek to establish a legal principle that members of warring factions within an umbrella conspiracy necessarily lack the unity of interest to be conspirators in the umbrella conspiracy, we reject that principle. Defendants may simultaneously be members of two conspiracies.  We have already ruled that another conspiracy, larger than the one charged at trial, may provide the basis for the admission of the coconspirator's statements. See United States v. Innamorati, 996 F.2d 456, 486 (1st Cir. 1993) ("Whether this was a separate conspiracy or part of the larger . . . conspiracy makes no

difference so far as the admissibility of the statement . . . is concerned."); see also United States v. Gigante, 166 F.3d 75, 82 (2d Cir. 1999); United States v. Orena, 32 F.3d 704, 713 (2d Cir. 1994).

Here there was ample evidence of just such another conspiracy -- the Patriarca Family, writ large, and its drug dealing, extortion, and other criminal activities. Other case law from this court, as noted before, recognized the existence of that criminal conspiracy. See, e.g., Angiulo, 847 F.2d 956. The Hilton tapes discussions were in furtherance of that conspiracy. The defendants rely on Gigante, which states that "organized crime membership alone" does not suffice to establish a conspiracy. 166 F.3d at 83. That is true, but that is not the situation here. In Gigante the supposed coconspirators were members of different mafia families which had different goals, while in this case, the declarants and the defendants were part of the same Family which shared common goals.

In this context, the more important question is whether the statements made were "in furtherance of" the conspiracy of which both defendants and declarants were members and whether the statements were relevant. Under this aspect of the test, the Luisi and Rossetti statements are a closer matter. Their statements concerned the factional dispute. If these were simply statements by rival faction members about the factional dispute, defendants would have a stronger argument that the statements were not made in furtherance of a

-22-

conspiracy to which they belonged.  But context is important.  The statements were made by members of the Salemme faction to Romano, a member of the Carrozza faction, during a peace meeting between the two factions to see if the conflict could be settled.  The internecine warfare was upsetting the business and sapping away the energies of the Patriarca Family enterprise.  The murders were bad for business and the Family had an interest in stopping them.   In this context, the statements were made in furtherance of and in the course of a common conspiracy.

Marino also makes a fleeting argument that he was an outsider to the Patriarca Family, and only connected to it tangentially through Carrozza.  If Marino was not part of the Patriarca Family conspiracy, the coconspirator statements would not be admissible against him.  Under United States v. Petrozziello, 548 F.2d 20, 23 (1st Cir. 1977), the district court was required to find by a preponderance of the evidence that the defendants and the declarants were coconspirators and that the statements were made in furtherance of the conspiracy.  The district court did make such a finding.  We review for clear error, Mojica-Baez, 229 F.3d at 304,  and we find none.  Both Marino and Patti were at the Santarpio's restaurant meeting where members of the Carrozza faction planned murders of the Salemme faction.  It was not clear error to reject Marino's argument that he was an outsider.

## 4. RICO Enterprise

(Marino)

Marino argues that the evidence was not sufficient to show that one of the predicate acts for which he was convicted amounted to "conduct[ing] or participat[ing] . . . in the conduct of [the] enterprise's affairs through a pattern of racketeering activity" as required under 18 U.S.C. § 1962(c), which defines a substantive RICO violation. The predicate act in question was a 1994 drug trafficking conspiracy with Romano Sr., Patti, Scarpa, and Ciampi, all of whom were Carrozza faction members. RICO requires two predicate acts and Marino's effort here is to knock out one of the two.

Marino, using the common shorthand phrase, says there was not a sufficient "nexus" between the drug trafficking conspiracy and the enterprise, the Patriarca Family. He argues that there was no evidence that this drug conspiracy was part of the Patriarca Family operation, that the profits were shared with the Family, that the drug conspiracy somehow furthered the Family, that Carrozza as head of the faction had anything to do with the drug conspiracy, or that by virtue of whatever position Marino had in the Family he was enabled to commit the drug conspiracy. In sum, he says there was no evidence that the drug conspiracy was anything other than a freelance operation unrelated to the Patriarca Family.

-24-

Marino's argument raises the issue of what standards are used to evaluate whether a sufficient nexus has been shown for the purposes of 18 U.S.C. § 1962(c).  The statutory language at issue is:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs <u>through a pattern of racketeering activity</u> or collection of unlawful debt.

18 U.S.C. § 1962(c) (emphasis added).  The focus of Marino's argument is on the "through a pattern of racketeering activity" phrase.

It is clear that by using the word "through," Congress intended some connection between the defendant's predicate acts and the enterprise.  The question before us is whether Marino participated in the operations of the Patriarca Family <u>through</u> the drug trafficking conspiracy.  Black's Law Dictionary defines the word "through" as "[b]y means of, in consequence of, by reason of." <u>Black's Law Dictionary</u> 1481 (6th ed. 1990).  The Oxford English Dictionary defines "through" as meaning, among other things, "[i]ndicating medium, means, agency or instrument: By means of, by the action of . . . .  By the instrumentality of."[4] XVIII <u>Oxford English Dictionary</u> 11 (2d ed. 1989).

---

[4]    Proving that some things remain constant in human nature, the first historic example in the Oxford English Dictionary of this use of the word "through" comes from the Lindisfarne Gospels, Luke 17:1, circa 950.  The modern translation of this passage from Luke is entitled The Treatment of Offences, and reads "[t]hen he said unto the disciples, It is impossible but that offences will come: but woe unto him, through whom they come."  Luke 17:1 (King James).

Each of these phrases offers a way of proving the participation or conduct was "through a pattern of racketeering activity." A sufficient nexus or relationship exists between the racketeering acts and the enterprise if the defendant was able to commit the predicate acts by means of, by consequence of, by reason of, by the agency of, or by the instrumentality of his association with the enterprise.

The requirement "through a pattern of racketeering activity" has been met in several situations. When the defendant uses his position in the enterprise to commit the racketeering acts, the "through" requirement is fulfilled. See, e.g., United States v. Grubb, 11 F.3d 426, 439-40 (4th Cir. 1993) ("the affairs of the enterprise were conducted through a pattern of racketeering activities" because "the record show[ed] beyond doubt that the power and prestige of [defendant's] office placed him in a position to perform the discrete, corrupt and fraudulent acts of which he was convicted and which make up the RICO predicate offenses"); United States v. Ruiz, 905 F.2d 499, 504 (1st Cir. 1990) (holding that sufficient relationship between the predicate acts and the enterprise existed where defendant's ability to commit the crimes was "inextricably intertwined with his authority and activities as an employee of [the police department]"). In addition, when the resources, property, or facilities of the enterprise are used by the defendant to commit the predicate acts, the "through" requirement is fulfilled. See, e.g., Grubb, 11 F.3d at 439

-26-

("[C]onsidering the fact that [defendant] physically used his judicial office . . . i.e. the telephones and the physical office itself . . . a sufficient nexus is established."); Ruiz, 905 F.2d at 504 (use of enterprise resources such as data and inside information contributed to establishing a sufficient nexus); United States v. Carter, 721 F.2d 1514, 1527 (11th Cir. 1984) (use of a dairy farm's land, employees, and office in drug smuggling created a nexus between the smuggling and the farm); United States v. Webster, 669 F.2d 185 (4th Cir. 1982) (help from club employees and use of club telephone and property established sufficient nexus between enterprise and racketeering activity).

It is not necessary to make other showings in order to fulfill the "through" requirement. It is unnecessary for the pattern of racketeering to have benefitted the enterprise in any way. Grubb, 11 F.3d at 439. The pattern of racketeering activity does not have to "affect the everyday operations of the enterprise," United States v. Starrett, 55 F.3d 1525, 1542 (11th Cir. 1995), and the defendant need not have channeled the proceeds of the racketeering activity into the enterprise. United States v. Kovic, 684 F.2d 512, 517 (7th Cir. 1982).

The evidence here was sufficient to meet the "through" requirement connecting the predicate act to the enterprise. Jurors, mindful of the adage that you are known by the company you keep, could easily infer that the drug conspiracy had a sufficient nexus to the Patriarca Family. All of Marino's fellow drug conspirators were

Carrozza faction members, and Ciampi owned the club where the members tended to hang out and store their drugs. The conspirators supplied drugs to each other for distribution to customers and gave free cocaine to members of the Family to reward them for shootings. Further, coconspirator Romano handled things for both Carrozza and Joseph Russo, a capo and former consigliere of the Family. Romano used the names of Carrozza and Russo to collect money for cocaine distribution. This is but the clearest example of the conspirators' positions in the Patriarca Family facilitating their commission of the drug trafficking conspiracy.

We reject Marino's argument.


## 5. Jury Instructions

(Marino)

Marino makes five separate claims that the trial court erred in its instructions to the jury. Normally, a claim of jury instruction error is reviewed de novo. United States v. Woodward, 149 F.3d 46, 68-69 (1st Cir. 1998). When no proposed instructions are given, and no objection is made, the standard of review for the jury instructions is plain error. United States v. Crochiere, 129 F.3d 233, 237 (1st Cir. 1997). Marino objected to all but one of the jury instructions which he now challenges. He did not make an objection to the trial court's instruction on the predicate act of conspiracy to murder thirteen named

individuals based on his concerns for juror unanimity, so we review that claim for plain error.

a. Massachusetts Law, Aiding and Abetting a Conspiracy Instruction

A brief description of the relationship between state and federal criminal law under RICO and VICAR is necessary to understand this issue. Under RICO, a "racketeering act" may be a predicate act which is chargeable under either certain enumerated federal statutes or under state law, as follows:

> "racketeering activity" means (A) any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or listed chemical . . . which is chargeable under State law and punishable by imprisonment for more than one year; (B) any act which is indictable under any of the following provisions of title 18, United States Code . . . .

18 U.S.C. § 1961(1). As to VICAR, it provides for the punishment of anyone who:

> as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, or for purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States, or attempts or conspires so to do . . . .

18 U.S.C. § 1959(a).

Here one of the predicate acts (racketeering act B) involved a violation of federal law -- a conspiracy to sell illegal drugs in

violation of 21 U.S.C. § 846.  This argument concerns the other predicate act (racketeering act A-1), a conspiracy to murder thirteen individuals in violation of state law.

Marino argues that the court erroneously charged the jury that he could be found guilty of the predicate crime of conspiracy to murder if he was found to be aiding and abetting the conspiracy. Marino claims that because the predicate act of conspiracy to murder is a state law crime, and because Massachusetts state law has never recognized as a theory of liability the aiding and abetting of a conspiracy, the trial court erred.

Two instructions on aiding and abetting a conspiracy were given, and Marino objected to both instructions.  First, the court instructed the jury on Count One -- the substantive RICO violation under 18 U.S.C. § 1962(c); second, the court instructed the jury on Counts Three and Fourteen -- the VICAR violations.

As to the first, the court did not expressly link aiding and abetting to conspiracy, but rather stated that the defendant could be found guilty of the substantive RICO violation, if the jury found that he "committed, or aided and abetted the commission of, at least two acts of racketeering." As a statement of federal law, this is plainly correct.  Aiding and abetting liability is inherent in every federal substantive crime. United States v. Sanchez, 917 F.2d 607, 611 (1st Cir. 1990).

-30-

In the second instance the court instructed the jury that

> [t]o establish a violation of the charge committing or aiding and abetting a violent crime in aid of racketeering, as charged in Counts 3 and 14 of the indictment, the government must prove the following beyond a reasonable doubt: . . . third, that the defendant committed, or aided and abetted the alleged crime of violence, that is, the conspiracy to murder, assault with a dangerous weapon, or attempted murder, in violation of state law.

Here the court clearly instructed the jury on aiding and abetting a conspiracy to murder, which conspiracy was a state law crime.

Some courts have held that it is not necessary for a district court to instruct the jury on each element of the state law crime which is used as a predicate act in a RICO prosecution. United States v. Watchmaker, 761 F.2d 1459, 1469 (11th Cir. 1985); United States v. Bagaric, 706 F.2d 42, 62-63 (2d Cir. 1983). These courts have stated that "[u]nder RICO . . . state offenses are included by generic designation." Bagaric, 706 F.2d at 62. But for a crime to be chargeable under state law, it must at least exist under state law. See United States v. Carrillo, 229 F.3d 177, 184-86 (2d Cir.), cert. denied sub nom. Ocasio v. United States, 531 U.S. 1026 (2000); Bagaric, 706 F.2d at 63 (if "the racketeering act is not prohibited at all under state law" it may not serve as a predicate act for RICO purposes). If, as Marino argues, aiding and abetting a conspiracy is not a crime that can be charged under Massachusetts state law, it follows that a jury instruction to this effect is erroneous.

-31-

Marino argues that because Massachusetts courts have "recognized the fundamental distinctions between accomplice and conspiratorial liability," they would not recognize the crime of aiding and abetting a conspiracy. It is true that Massachusetts law acknowledges the difference between accomplice liability and conspiratorial liability, i.e., that by aiding and abetting a crime one does not automatically become a coconspirator because one is not necessarily part of the conspiratorial agreement (the key to the crime of conspiracy). Commonwealth v. Cook, 10 Mass. App. Ct. 668, 411 N.E.2d 1326, 1330-32 (1980).

The Massachusetts aiding and abetting statute reads: "Whoever aids in the commission of a felony, or is accessory thereto before the fact by counselling, hiring or otherwise procuring such felony to be committed, shall be punished in the manner provided for the punishment of the principal felon." Mass. Gen. Laws ch. 274, § 2. Just like the federal statute for aiding and abetting, the Massachusetts statute does not create a separate offense, but rather makes those who aided and abetted in the commission of a crime punishable as principals.[5] Commonwealth v. Perry, 357 Mass. 149, 256 N.E.2d 745, 747 (1970); Sanchez, 917 F.2d at 611. Because the Massachusetts aiding and

---

[5] The federal statute for aiding and abetting has very similar language to the Massachusetts statute. It reads: " Whoever commits an offense against the United states or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." 18 U.S.C. § 2(a).

abetting statute is a statute of general application, it applies to the crime of conspiracy, just as it applies to any other offense, such as robbery, unless there is a specific reason why it should not apply to conspiracy.

No such reason is found in the federal analogue. Federal law allows for the crime of aiding and abetting a conspiracy. United States v. Oreto, 37 F.3d 739, 751 (1st Cir. 1994). Federal courts and commentators have stated the concern that without a rule which allows for conviction for aiding and abetting a conspiracy, people who knowingly help an illegal conspiracy would go unpunished. United States v. Galiffa, 734 F.2d 306, 310-11 (7th Cir. 1984); 2 W. LaFave & A. Scott, Substantive Criminal Law § 6.4, at 75-76 (1986).

The only Massachusetts source that arguably suggests that Massachusetts law would not be open to a conviction of aiding and abetting a conspiracy is Cook, 411 N.E.2d at 1330-32. In Cook, the state appeals court held that a defendant cannot be found guilty of a conspiracy if he was simply found to have aided and abetted in the commission of the substantive crime. Id. This question is different from the question of whether one may aid and abet the conspiracy itself. Furthermore, in Cook there was only sufficient evidence to show that the defendant helped another after the completion of the crime, or at the scene of the crime. Id. at 1329. There was no

evidence that he knew about the conspiracy or the plan to commit the crime.  Id.

Under Massachusetts law, to prove a defendant guilty of aiding and abetting a crime, the state must prove that "someone committed the prohibited act, and that the defendant intentionally assisted the principal in the commission of the crime while sharing the mental state required for that crime." Commonwealth v. Filos, 420 Mass. 348, 649 N.E.2d 1085, 1089 (1995).  Just as under federal law, a defendant can only be convicted of aiding and abetting a conspiracy if he knew about the conspiracy.  There is no Massachusetts case that prevents a defendant from being convicted of aiding and abetting a conspiracy to murder when the defendant knew about the conspiracy or the agreement to conspire.

On its face the Massachusetts aiding and abetting statute applies to all crimes, and there is nothing in Massachusetts law that counsels against the application of the statute to the crime of conspiracy to murder, where there is evidence that the defendant knew of the conspiracy.  We cannot say that the jury instruction on aiding and abetting a state law conspiracy in this case was erroneous.

b. Multiple-Object Conspiracy Instruction

Marino claims that the trial court's charge to the jury concerning racketeering act A-1, which charged him with conspiring with others to murder thirteen named individuals in violation of state law,

-34-

was too broad, lowered the government's burden of proof, and was erroneous. The trial court instructed the jury that in order for it to find Marino guilty of the predicate act of conspiracy to murder "the government must show that the defendant . . . conspired or agreed to murder at least one of the 13 named individuals and that at the time he agreed to the murder, . . . defendant also had foresight or knowledge of the much broader scope of the conspiracy." Marino objected to this instruction.

Marino argues that because the predicate act of conspiracy to murder is a state law crime, Massachusetts state law definitions should be used, and Massachusetts law on conspiracy is far narrower than the federal law. According to Marino, under Massachusetts law the government must prove a greater degree of knowledge of the plan than under federal law.

Some courts have held that state offenses are included in RICO only for "generic designation." Bagaric, 706 F.2d at 62; see also United States v. Salinas, 564 F.2d 688, 690-93 (5th Cir. 1977); United States v. Frumento, 563 F.2d 1083, 1087 (3d Cir. 1977). But see United States v. Carrillo, 229 F.3d 177, 185-86 (2d Cir. 2000) (expressing view that RICO may require the government to prove the essential elements of the state law crime used as a predicate act). We need not decide the question of how the state law crimes used as RICO predicate acts are to be defined, generally or by element.

Under both federal and Massachusetts law, a defendant need not be aware of all the details of the criminal plan in order to be convicted of the conspiracy. Blumenthal v. United States, 332 U.S. 539, 557 (1947); United States v. Hinds, 856 F.2d 438, 443 (1st Cir. 1988); Commonwealth v. Nelson, 370 Mass. 192, 346 N.E.2d 839, 841-42 (1976); Commonwealth v. Kiernan, 348 Mass. 29, 201 N.E.2d 504, 519 (1964) (citing Blumenthal).

Here, there was evidence that Marino was at the Santarpio's restaurant meeting of the Carrozza faction members where the need to eliminate their enemies was discussed. At this meeting, four members of the Salemme faction were specifically named and targeted for murder. These four members were part of the group of thirteen targets named in the indictment. In addition, after the meeting Carrozza, the head of the faction, told another faction member, Romano, that he had "a lot of faith in [Marino]." This statement associates Marino with the cause of the Carrozza faction. Marino was often present at Ciampi's club, which was the center of operations for the Carrozza faction. He participated in meetings planning the murders of Salemme and Hilson, both targets named in the indictment. Marino also went on several hunting trips to murder members of the Salemme faction. He added to the accumulation of weapons for the Carrozza faction: he broke into the doughnut shop, stole some guns, and brought them back to Ciampi's club. There was sufficient evidence to show that Marino was part of the conspiracy to

murder members of the Salemme faction, and the inference could readily be drawn that he foresaw the murder or attempted murder of all thirteen named individuals.

Thus, even assuming some differences in the application of conspiracy law in Massachusetts and the federal courts, the differences are not material in this case, and the district court did not err.

c. Unanimity Instruction

The trial court instructed that "the government must show that the defendant . . . conspired or agreed to murder at least one of the 13 named individuals and that at the time he agreed to the murder . . . defendant also had foresight or knowledge of the much broader scope of the conspiracy." Marino argues the court had to instruct the jury that it must be unanimous in its verdict as to which one, or more, of the thirteen named individuals the defendant conspired to kill. Because the defendant did not object to the jury charge on these grounds, this instruction is reviewed for plain error. United States v. Gomez, 255 F.3d 31, 37 (1st Cir. 2001).

It is possible that the failure to give a specific instruction that the jury must agree unanimously as to whom Marino conspired to murder was error on the facts of this case. Compare United States v. Helmsley, 941 F.2d 71, 91 (2d Cir. 1991) (approving a "careful" charge directing jurors that they "must all agree on the specific object the defendant agreed to try to accomplish"), with

-37-

<u>United States</u> v. <u>Dillman</u>, 15 F.3d 384, 392 (5th Cir. 1994) ("[J]urors need not agree on which particular offenses [a] defendant intended personally to commit as long as there is but one conspiracy that encompasses the particular offenses charged."). We decline to reach the question. If there was error, it was not plain, given the unsettled state of the law.

d. Instruction on Elements of Substantive RICO Violation

Marino argues that the trial court erred in instructing the jury on three of the five RICO elements. He objected to the charge. For a defendant to be found guilty of a substantive RICO violation under 18 U.S.C. § 1962(c), the government must prove beyond a reasonable doubt that (1) an enterprise existed; (2) the enterprise participated in or its activities affected interstate commerce; (3) the defendant was employed by or was associated with the enterprise; (4) the defendant conducted or participated in the conduct of the enterprise; (5) through a pattern of racketeering activity. <u>See</u> <u>United States</u> v. <u>Shifman</u>, 124 F.3d 31, 35 (1st Cir. 1997). Marino argues instructional error on what constituted "association with" the enterprise, and how great his involvement needed to be to be considered to have "conducted" or "participated" in the conduct of the enterprise. He also argues that the district court "diluted" the government's burden of proof when it instructed the jury on the requirement that the enterprise affect or participate in interstate commerce.

i. Association with and Participation in RICO Enterprise

The arguments about association with the enterprise and participation in the conduct of the enterprise go hand in hand. Marino argues that the instructions lowered the government's burden of proof on the degree of his involvement with the enterprise. He says that the instructions allowed the jury to find that it was enough to decide that he "was an outsider, a friend of Carrozza's, who aided and abetted Carrozza[] at Carrozza's direction" and from this "conclude that he was associated with the Patriarca Family and operated that enterprise."

The court instructed the jury that under RICO a person is associated with an enterprise

> if he knowingly participates, directly or indirectly, in the conduct of the affairs of an enterprise. One need not have an official position in the enterprise to be associated with it. One need not formally align himself with an enterprise to associate with it. Association may be by means of an informal or loose relationship. To associate has its plain meaning. . . . "Associated" means to be joined, often in a loose relationship, as a partner, fellow worker, colleague, friend, companion, or ally. Thus, although a person's role in the enterprise may be very minor, a person will still be associated with the enterprise if he knowingly joins with a group of individuals associated in fact who constitute the enterprise.

The instruction accurately described the meaning of "associated with" in § 1962(c). The requirement of association with the enterprise is not strict. "The RICO net is woven tightly to trap even the smallest fish, those peripherally involved with the enterprise." United States v. Elliot, 571 F.2d 880, 903 (5th Cir. 1978). The RICO statute seeks

-39-

to encompass those people who are "merely 'associated with'" the enterprise. Id.; see also United States v. Watchmaker, 761 F.2d 1459, 1476 (11th Cir. 1985). The defendant need only be "aware of at least the general existence of the enterprise named in the indictment," United States v. Console, 13 F.3d 641, 653 (3d Cir. 1993) (quoting United States v. Eufrasio, 935 F.2d 553, 577 n.29 (3d Cir. 1991)), and know about its related activities. United States v. Martino, 648 F.2d 367, 394 (5th Cir. 1981); see also United States v. Starrett, 55 F.3d 1525, 1551-52 (11th Cir. 1995).[6]

Marino's other objection goes to the "conduct" or "participate in" prong. The court instructed the jury that

> [t]he terms "conduct" and "participated in the conduct of" the affairs of an enterprise include the performance [of] acts, functions or duties which are related to the operation of the enterprise. . . . [T]he [government] must prove that the defendant had some part in the operation or management of the enterprise. The government need not prove that the defendant . . . exercised significant control over or within the enterprise. An enterprise is "operated" not just by upper management but also by lower-rung participants in the enterprise who are under the direction of upper management.

Marino argues that this charge does not comport with the Supreme Court's holding in Reves v. Ernst & Young, 507 U.S. 170 (1993). In

---

[6] Although this court has never articulated this broad standard for association with the enterprise in a criminal RICO case, it has done so in a civil RICO case. Aetna Cas. Sur. Co. v. P&B Autobody, 43 F.3d 1546, 1558-59 (1st Cir. 1994) (defining "associated with" to include one who buys an insurance policy from an insurer). We have also stated that "it is appropriate to rely on civil RICO precedent when analyzing criminal RICO liability. The standard is the same for both criminal and civil RICO violations." Shifman, 124 F.3d at 35 n.1.

Reves, the Court held that "an outside accounting firm employed by an enterprise was not subject to civil RICO liability unless it 'participate[d] in the operation or management of the enterprise itself.'" United States v. Oreto, 37 F.3d 739, 750 (1st Cir. 1994) (quoting Reves, 507 U.S. at 183) (alteration in original). Marino argues that the instruction to the jury "lowered the government's burden of proof [on the degree of Marino's participation in the enterprise] to mere aiding and abetting from the very bottom of the ladder."

Oreto holds that the government could prove that defendants "conduct[ed] or participate[d] . . . in the conduct of" the enterprise by a showing that the defendants "participated in the enterprise's decisionmaking" or that, if they were lower rung participants and not involved in the decision making, they were plainly integral to carrying out the process. Id. at 750. Here the government had evidence of both and the instruction was proper.

ii. Effect on Interstate Commerce

Marino argues that the district court's instructions misstated the degree to which the enterprise's activities must relate to interstate commerce. The trial court instructed that "[t]he evidence need not show any particular degree of or effect on interstate commerce. All that is required is some effect on interstate commerce." Marino argues that under the Supreme Court's rulings in United States

v. Lopez, 514 U.S. 549 (1995), and United States v. Morrison, 529 U.S. 598 (2000), the government had to show that the enterprise's activity had a substantial effect on interstate commerce.  That is not so.

In Lopez, the Gun-Free School Zones Act, 18 U.S.C. § 922(q) (Supp. II 1990) (amended 1994), was struck down because it did not have a "jurisdictional element which would ensure, through case-by-case inquiry, that the [activity] in question affect[ed] interstate commerce."  Lopez, 514 U.S. at 561.  In Morrison the Supreme Court invalidated the civil remedy provided by the Violence Against Women Act, 42 U.S.C. § 13981, for similar reasons: "[l]ike the Gun-Free School Zones Act at issue in Lopez, § 13981 contains no jurisdictional element establishing that the federal cause of action is in pursuance of Congress' power to regulate interstate commerce."  Morrison, 529 U.S. at 613.

In contrast, RICO contains a jurisdictional element: "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate . . . in the conduct of such enterprise's affairs . . . ."  18 U.S.C. § 1962(c) (emphasis added).  A number of circuit courts have held, post-Lopez, that the government does not need to show that the RICO enterprise's effect on interstate commerce is substantial.  United States v. Riddle, 249 F.3d 529, 537 (6th Cir.) (holding that "RICO enterprise's necessary

relationship to interstate commerce" is still "de minimis"), cert. denied, 122 S. Ct. 292 (2001); United States v. Juvenile Male, 118 F.3d 1344, 1347 (9th Cir. 1997) ("[A]ll that is required to establish federal jurisdiction in a RICO prosecution is a showing that the individual predicate racketeering acts have a de minimis impact on interstate commerce."); United States v. Miller, 116 F.3d 641, 674 (2d Cir. 1997) (holding that in a RICO case "the government need only prove that the individual subject transaction has a de minimis effect on interstate commerce"). We agree. See United States v. Doherty, 867 F.2d 47, 68 (1st Cir. 1989) ("RICO requires no more than a slight effect upon interstate commerce.").

Marino makes the same claim as to VICAR. VICAR applies only to those defendants whose violent acts are "as consideration for" payment from, or in hopes of "gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity." 18 U.S.C. § 1959(a). Such an enterprise must be "engaged in," or its "activities . . . affect, interstate or foreign commerce." Id. § 1959(b)(2). VICAR also has a jurisdictional element. United States v. Torres, 129 F.3d 710, 717 (2d Cir. 1997). As a result "§ 1959's requirements are met if the government establishes a connection between the § 1959 act of violence and a RICO enterprise which has a de minimis interstate commerce connection." Riddle, 249 F.3d at 538.

The district court's instructions that RICO and VICAR require only "some effect on interstate commerce" were not erroneous.

e. Rejected Instruction on Credibility of Rule 801(d)(2)(E) Declarants

Marino argues that the district court's refusal to include instructions on evaluating the credibility of out-of-court coconspirator declarants was erroneous.  The failure by a district court to give requested jury instructions is only reversible error if the requested instruction "(1) is substantively correct; (2) was not substantially covered in the charge given to the jury; and (3) concerns an important point in the trial so that the failure to give it seriously impaired the defendant's ability to effectively present a given defense."  United States v. Williams, 809 F.2d 75, 86 (1st Cir. 1986).

The district court instructed the jury as to its duty as "the sole judges of the credibility of the witnesses," about various factors it could consider in assessing credibility, and specifically cautioned the jury about testimony "of an alleged accomplice or of one who provides evidence against a defendant for immunity from punishment or for personal advantage or vindication." The court's credibility instructions as a whole were correct, and the instruction requested by Marino (after the jury was already charged) was substantially covered in the charge because the judge pointed out to the jury the potential

unreliability of witnesses who were former accomplices.  See United

States v. Hernandez-Escarsega, 886 F.2d 1560, 1573-75 (9th Cir. 1989).[7]


6. Sentencing Issues

(Marino)

a. Consideration of Souza's Murder

Due to the Carrozza faction's actions two men died: Devlin

and Souza.  The government claimed Marino was part of the conspiracy to

kill Souza and that his sentence should increase because the conspiracy

to murder Souza resulted in exactly that murder.

The trial judge agreed and held that the jury found Marino

joined a conspiracy to murder thirteen people, and the jury finding

disposed of the issue.  Marino's argument is that the jury finding did

not establish that Marino conspired to murder Souza.  The jury

instruction was: "[T]he government must show that the defendant . . .

conspired or agreed to murder at least one of the 13 named individuals

---

[7]      In addition, it is difficult to see any prejudice.  Marino
did not even attempt to attack the credibility of the non-testifying
declarants using Rule 806, which states:

When a hearsay statement, or a statement defined in Rule
801(d)(2)(C), (D), or (E), has been admitted in evidence, the
credibility of the declarant may be attacked . . . by any evidence
which would be admissible for those purposes if declarant had
testified as a witness.

Fed. R. Evid. 806.  The issue was instead the credibility of the
cooperating witnesses who testified to the declarants' statements; this
the district court addressed fully.

and that at the time he agreed to the murder, that defendant also had foresight or knowledge of the much broader scope of the conspiracy." The jury verdict establishes only that Marino agreed to murder at least one of thirteen individuals and he had foresight or knowledge of the broader scope of the conspiracy.

The trial judge, relying on the Presentence Report, found that the appropriate base offense level was 43 on Count One and Count Three. The sentencing guidelines for both the substantive RICO violation and VICAR contain cross-references to ascertain the base offense level by looking at "the underlying racketeering activity." U.S.S.G. § 2E1.1 (RICO); see id. § 2E1.3 (VICAR) (referring to "the underlying crime or racketeering activity"). The predicate act of conspiracy to murder under U.S.S.G. § 2A1.5 has a base offense level of 43 when the conspiracy resulted in death.

Marino argues that the court should not have considered Souza's murder because application note 5[8] to U.S.S.G. § 1B1.2 requires that before the court may do so either the jury or the judge must find that Marino conspired to kill Souza beyond a reasonable doubt.

---

[8]     In this case, the district court used the Guidelines Manual current at the time of sentencing, i.e., the Guidelines Manual issued in November 1999. We use the numbering from the 1999 Guidelines Manual in this opinion. In the most current Guidelines Manual, however, former application note 5 to § 1B1.2(d) is now application note 4. The language of the note has remained the same.

Guideline Section 1B1.2(d) specifically addresses a conviction on a multiple-object conspiracy: "A conviction on a count charging a conspiracy to commit more than one offense shall be treated as if the defendant had been convicted on a separate count of conspiracy for each offense that the defendant conspired to commit." U.S.S.G. § 1B1.2(d). Application note 5 to § 1B1.2 cautions:

> Particular care must be taken in applying subsection (d) because there are cases in which the jury's verdict does not establish which offense(s) was the object of the conspiracy. In such cases, subsection (d) should only be applied with respect to any object offense alleged in the conspiracy count if the court, were it sitting as trier of fact, would convict the defendant of conspiring to commit that object offense.

This note has been interpreted to mean that the sentencing court should only consider an object offense in a multiple object conspiracy if either the jury finds at conviction, or the court finds at sentencing, that beyond a reasonable doubt the defendant conspired to commit that particular offense. United States v. McKinley, 995 F.2d 1020, 1026 (11th Cir. 1993).

However, this court has previously ruled that this cautionary note does not apply to determining the sentence for a substantive RICO violation.[9] United States v. Carrozza, 4 F.3d 70, 78-79 (1st Cir.

---

[9] According to the logic and reasoning of Carrozza, application note 5 does not apply to a VICAR violation either, because the guideline for VICAR contains substantially identical structure and language to the RICO guideline examined in Carrozza. Compare U.S.S.G. § 2E1.1 with U.S.S.G. § 2E1.3.

1993).  The question of whether application note 5 would apply in a case with facts similar to this case, but involving a conspiracy to murder conviction that was not embedded in a RICO or VICAR charge is still open, but it is not one we reach here.  Carrozza holds that in a RICO case, in determining the base offense level, the sentencing court should not limit its relevant conduct inquiry to the predicate acts charged against the defendant, but instead should consider "all conduct reasonably foreseeable to the particular defendant in furtherance of the RICO enterprise to which he belongs."  Id. at 74.

Under relevant conduct analysis "in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity" should be considered in determining the base offense level. U.S.S.G. § 1B1.3(a)(1)(B).  In Carrozza, this court interpreted this guideline to mean that in sentencing a defendant in a jointly undertaken criminal activity case, such as a RICO violation,

> the district court must determine (1) the scope of the joint criminal activity explicitly or implicitly agreed to by [the defendant] jointly with others; (2) whether the criminal acts proffered as relevant conduct were in furtherance of the jointly undertaken criminal activity; and (3) whether the proffered acts were reasonably foreseeable in connection with that criminal activity.

Id. at 76. When conducting a relevant conduct analysis, the district court need only find that the relevant conduct occurred by a preponderance of the evidence. United States v. Caba, 241 F.3d 98, 101 (1st Cir. 2001).

The trial judge was not explicit, save for his statement that the jury found Marino guilty of conspiracy to murder. We think, nonetheless, that the sentencing court made an implicit finding that the murder of Souza was reasonably foreseeable to Marino. This was the prosecutor's argument in response to Marino's objection, and the court overruled the objection, accepting the prosecutor's argument. Souza was part of the faction which Marino's faction was trying to eliminate and Marino was present at various meetings selecting individuals to target. Marino was also responsible for stealing and accumulating ammunition for use by his faction. Souza was one of the people suspected in the murder of Romano Jr., also targeted by the Carrozza faction. In addition, when Souza's body was found, he had with him an address book with the license plate number of Marino's girlfriend written in it. Marino's girlfriend had obtained this license plate number only a few weeks before Souza's death. This was evidence of some connection between Souza and Marino, which may have given Marino some particular reason to want Souza dead, making it more likely he knew of the faction's plans.

We review a sentencing court's findings regarding the role played by the defendant and the activities of the conspiracy reasonably foreseeable to him for clear error. United States v. Hernández, 218 F.3d 58, 71 (1st Cir. 2000). The sentencing court's consideration of the Souza murder in sentencing Marino was not clearly erroneous.

b. Apprendi Error

Marino makes two arguments that the district court violated the Supreme Court's ruling in Apprendi v. New Jersey, 530 U.S. 466 (2000), in sentencing him. Both are disposed of under circuit precedent by the fact that he was sentenced within the statutory maximum.

First, Marino says that several acts for which he was not indicted, and which were not submitted to the jury, were used by the district court to increase the maximum guideline sentence. For example, the sentencing court took into account Marino's attempted murder of Salemme in 1989, but the jury did not convict him of this offense. In addition, the jury convicted him of drug conspiracy, but the conviction did not specify a quantity of cocaine. The sentencing court found that Marino was responsible for at least 500 grams of cocaine, and sentenced him accordingly. As Marino himself candidly concedes, however, this court rejected his "expansive reading of Apprendi" in United States v. Caba, 241 F.3d 98, 101 (1st Cir. 2001). Marino makes the same argument that the defendant made in Caba. Caba

-50-

held that his argument fails because _Apprendi_ does not apply in cases in which a guidelines finding does not increase the sentence beyond the statutory maximum, _id._, as Marino's sentence here.

Second, Marino argues that _Apprendi_ was violated because the court and not the jury decided that his RICO and VICAR violations subjected him to the maximum penalty of life imprisonment. However, "_Apprendi_ only applies when the disputed 'fact' enlarges the applicable statutory maximum _and_ the defendant's sentence exceeds the original maximum," _id._ (emphasis added), unlike here. The sentencing court did not err.[10]

## 7. Double Jeopardy

(Marino)

---

[10] The government has said that Patti could have a valid different _Apprendi_ argument. Patti was sentenced to 360 months' imprisonment on each of Counts One, Two, and Thirty, to run concurrently with one another. The district court sentenced Patti beyond the statutory maximum of 240 months' imprisonment for Counts One and Two. This matters not to the term of incarceration because the 360 months sentence for Count Thirty is appropriate, and the three sentences run concurrently. Because this argument was not raised by Patti we do nothing with it.

In addition, the government conceded at oral argument that Marino and Patti may have had a valid _Apprendi_ claim with regard to their supervised release terms. However, this issue was not raised by either defendant in the district court or on appeal. We therefore do not deal with it here. Counsel for both sides are free, of course, to agree on an appropriate adjustment and, if timely, raise the issue with the district court.

Marino argues that the general prohibition against multiple punishments for the same acts bars the multiple punishments in his case. Specifically, he claims that he cannot be punished separately (as he was) for the substantive RICO violation and for RICO conspiracy. In addition, he argues that the VICAR violation (Count Three) is a lesser included offense of the substantive RICO violation because the same offense is used as one of the RICO predicate acts.

The Double Jeopardy Clause prohibits successive prosecutions or punishments for the same offense. United States v. Ursery, 518 U.S. 267, 273 (1996). The test to determine whether two offenses are considered the same offense for double jeopardy is set forth in Blockburger v. United States, 284 U.S. 299 (1932): two offenses are separate offenses if each contains an element not contained in the other. Because a RICO conspiracy contains a different element than a substantive RICO violation, namely an agreement with others to commit a substantive RICO violation, a substantive RICO violation and a RICO conspiracy are not the same offense for double jeopardy purposes.

The Supreme Court has long recognized that "in most cases separate sentences can be imposed for the conspiracy to do an act and for the subsequent accomplishment of that end." Iannelli v. United States, 420 U.S. 770, 777-78 (1975). The only exception is Wharton's Rule, which applies only "when the substantive offense is of a sort that necessarily requires the active, or culpable, participation of the

same . . . people for its successful completion," such as in the case of adultery.  United States v. Previte, 648 F.2d 73, 76 (1st Cir. 1981).  A RICO conspiracy and a RICO violation do not necessarily require the participation of the same people.  Instead, the agreement to violate RICO by conspiring to commit racketeering acts could be made by a different group of people than the ones who actually end up committing the substantive violation.

We join the circuits that have held that a substantive RICO violation and a RICO conspiracy are not the same offense for double jeopardy purposes, and accordingly, can be punished separately.  See, e.g., United States v. Sessa, 125 F.3d 68, 71 (2d Cir. 1997); United States v. Rone, 598 F.2d 564, 569-71 (9th Cir. 1979).

Marino's argument that the VICAR violation (conspiracy to murder thirteen individuals) is a lesser included offense of the substantive RICO violation is similarly flawed.  Many courts, including this one, have considered the issue of whether the double jeopardy clause prohibits separate punishments for a substantive RICO violation as well as its predicate acts.  These courts have reached the conclusion that it does not.  United States v. Greenleaf, 692 F.2d 182, 189 (1st Cir. 1982); see also United States v. Coonan, 938 F.2d 1553, 1566 (2d Cir. 1991); United States v. Beale, 921 F.2d 1412, 1437 (11th Cir. 1991); United States v. Kragness, 830 F.2d 842, 864 (8th Cir. 1987); United States v. Hawkins, 658 F.2d 279, 287 (5th Cir. 1981).

Here, the VICAR violation is a predicate act as well as its own separate violation.  The district court did not err in punishing Marino separately for both offenses.

## Conclusion

The judgment of the district court is <u>affirmed</u>.